# AUSTIN *v.* UNITED STATES

No. 92–6073.   Argued April 20, 1993—Decided June 28, 1993

BLACKMUN, J., delivered the opinion of the Court, in which WHITE, STEVENS, O'CONNOR, and SOUTER, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 623. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 628.

*Richard L. Johnson* argued the cause for petitioner. With him on the briefs was *Scott N. Peters.*

*Miguel A. Estrada* argued the cause for the United States. With him on the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Keeney,* and *Thomas E. Booth.\**

---

\*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Gerard E. Lynch, Steven R. Shapiro,* and *John A. Powell;* and for the National Association of Criminal Defense Lawyers by *David B. Smith* and *Justin M. Miller.*

*Roger L. Conner, Robert Teir, Edward S. G. Dennis, Jr.,* and *Peter Buscemi* filed a brief for the American Alliance for Rights and Responsibilities et al. urging affirmance.

A brief of *amici curiae* was filed for the State of Arizona et al. by *Grant Woods,* Attorney General of Arizona, and *Cameron H. Holmes* and *Sandra*

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case, we are asked to decide whether the Excessive Fines Clause of the Eighth Amendment applies to forfeitures of property under 21 U. S. C. §§ 881(a)(4) and (a)(7). We hold that it does and therefore remand the case for consideration of the question whether the forfeiture at issue here was excessive.

## I

On August 2, 1990, petitioner Richard Lyle Austin was indicted on four counts of violating South Dakota's drug laws. Austin ultimately pleaded guilty to one count of possessing cocaine with intent to distribute and was sentenced by the state court to seven years' imprisonment. On September 7, the United States filed an *in rem* action in the United States District Court for the District of South Dakota seeking forfeiture of Austin's mobile home and auto body shop under 21

*L. Janzen,* Assistant Attorneys General, *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, and *Gary W. Schons, Domenick Galluzzo,* Acting Chief State's Attorney of Connecticut, and by the Attorneys General for their respective jurisdictions as follows: *Winston Bryant* of Arkansas, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Robert A. Marks* of Hawaii, *Larry EchoHawk* of Idaho, *Robert T. Stephan* of Kansas, *Chris Gorman* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Michael Carpenter* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Michael Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Jeffrey R. Howard* of New Hampshire, *Tom Udall* of New Mexico, *Michael F. Easley* of North Carolina, *Susan B. Loving* of Oklahoma, *Ernest D. Preate, Jr.,* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *T. Travis Medlock* of South Carolina, *Dan Morales* of Texas, *Jan Graham* of Utah, *Stephen D. Rosenthal* of Virginia, *Christine O. Gregoire* of Washington, *Joseph B. Meyer* of Wyoming, and *Rosalie Simmonds Ballentine* of the Virgin Islands.

U. S. C. §§ 881(a)(4) and (a)(7).[1]  Austin filed a claim and an answer to the complaint.

On February 4, 1991, the United States made a motion, supported by an affidavit from Sioux Falls Police Officer Donald Satterlee, for summary judgment.  According to Satterlee's affidavit, Austin met Keith Engebretson at Austin's body shop on June 13, 1990, and agreed to sell cocaine to Engebretson.  Austin left the shop, went to his mobile home, and returned to the shop with two grams of cocaine which he sold to Engebretson.  State authorities executed a search warrant on the body shop and mobile home the following day.  They discovered small amounts of marijuana and cocaine, a .22 caliber revolver, drug paraphernalia, and approximately $4,700 in cash.  App. 13.  In opposing summary judgment, Austin argued that forfeiture of the properties would violate the Eighth Amendment.[2]  The District Court rejected this argument and entered summary judgment for the United States.  *Id.*, at 19.

The United States Court of Appeals for the Eighth Circuit "reluctantly agree[d] with the government" and affirmed.

---

[1] These statutes provide for the forfeiture of:

"(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances, their raw materials, and equipment used in their manufacture and distribution]

.     .     .     .     .

"(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment . . . ."

Each provision has an "innocent owner" exception.  See §§ 881(a)(4)(C) and (a)(7).

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U. S. Const., Amdt. 8.

*United States* v. *One Parcel of Property,* 964 F. 2d 814, 817 (1992). Although it thought that "the principle of proportionality should be applied in civil actions that result in harsh penalties," *ibid.,* and that the Government was "exacting too high a penalty in relation to the offense committed," *id.,* at 818, the court felt constrained from holding the forfeiture unconstitutional. It cited this Court's decision in *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663 (1974), for the proposition that, when the Government is proceeding against property *in rem,* the guilt or innocence of the property's owner "is constitutionally irrelevant." 964 F. 2d, at 817. It then reasoned: "We are constrained to agree with the Ninth Circuit that '[i]f the constitution allows *in rem* forfeiture to be visited upon innocent owners . . . the constitution hardly requires proportionality review of forfeitures.'" *Ibid.,* quoting *United States* v. *Tax Lot 1500,* 861 F. 2d 232, 234 (CA9 1988), cert. denied *sub nom. Jaffee* v. *United States,* 493 U. S. 954 (1989).

We granted certiorari, 506 U. S. 1074 (1993), to resolve an apparent conflict with the Court of Appeals for the Second Circuit over the applicability of the Eighth Amendment to *in rem* civil forfeitures. See *United States* v. *Certain Real Property,* 954 F. 2d 29, 35, 38–39, cert. denied *sub nom. Levin* v. *United States,* 506 U. S. 815 (1992).

## II

Austin contends that the Eighth Amendment's Excessive Fines Clause applies to *in rem* civil forfeiture proceedings. See Brief for Petitioner 10, 19, 23. We have had occasion to consider this Clause only once before. In *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257 (1989), we held that the Excessive Fines Clause does not limit the award of punitive damages to a private party in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages. *Id.,* at 264. The Court's opinion and JUSTICE O'CONNOR's

opinion, concurring in part and dissenting in part, reviewed in some detail the history of the Excessive Fines Clause. See *id.*, at 264–268, 286–297. The Court concluded that both the Eighth Amendment and § 10 of the English Bill of Rights of 1689, from which it derives, were intended to prevent *the government* from abusing its power to punish, see *id.*, at 266–267, and therefore that "the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government," *id.*, at 268.[3]

We found it unnecessary to decide in *Browning-Ferris* whether the Excessive Fines Clause applies only to criminal cases. *Id.*, at 263. The United States now argues that

> "any claim that the government's conduct in a civil proceeding is limited by the Eighth Amendment generally, or by the Excessive Fines Clause in particular, must fail unless the challenged governmental action, despite its label, would have been recognized as a *criminal* punishment at the time the Eighth Amendment was adopted." Brief for United States 16 (emphasis added).

It further suggests that the Eighth Amendment cannot apply to a civil proceeding unless that proceeding is so punitive that it must be considered criminal under *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144 (1963), and *United States* v. *Ward,* 448 U. S. 242 (1980). Brief for United States 26–27. We disagree.

Some provisions of the Bill of Rights are expressly limited to criminal cases. The Fifth Amendment's Self-Incrimination Clause, for example, provides: "No person . . . shall be compelled in any criminal case to be a witness

---

[3] In *Browning-Ferris,* we left open the question whether the Excessive Fines Clause applies to *qui tam* actions in which a private party brings suit in the name of the United States and shares in the proceeds. See 492 U. S., at 276, n. 21. Because the instant suit was prosecuted by the United States and because Austin's property was forfeited to the United States, we have no occasion to address that question here.

against himself." The protections provided by the Sixth Amendment are explicitly confined to "criminal prosecutions." See generally *Ward*, 448 U. S., at 248.[4] The text of the Eighth Amendment includes no similar limitation. See n. 2, *supra.*

Nor does the history of the Eighth Amendment require such a limitation. JUSTICE O'CONNOR noted in *Browning-Ferris:* "Consideration of the Eighth Amendment immediately followed consideration of the Fifth Amendment.

---

[4] As a general matter, this Court's decisions applying constitutional protections to civil forfeiture proceedings have adhered to this distinction between provisions that are limited to criminal proceedings and provisions that are not. Thus, the Court has held that the Fourth Amendment's protection against unreasonable searches and seizures applies in forfeiture proceedings, see *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U. S. 693, 696 (1965); *Boyd* v. *United States*, 116 U. S. 616, 634 (1886), but that the Sixth Amendment's Confrontation Clause does not, see *United States* v. *Zucker*, 161 U. S. 475, 480–482 (1896). It has also held that the due process requirement that guilt in a criminal proceeding be proved beyond a reasonable doubt, see *In re Winship*, 397 U. S. 358 (1970), does not apply to civil forfeiture proceedings. See *Lilienthal's Tobacco* v. *United States*, 97 U. S. 237, 271–272 (1878).

The Double Jeopardy Clause has been held not to apply in civil forfeiture proceedings, but only in cases where the forfeiture could properly be characterized as remedial. See *United States* v. *One Assortment of 89 Firearms*, 465 U. S. 354, 364 (1984); *One Lot Emerald Cut Stones* v. *United States*, 409 U. S. 232, 237 (1972); see generally *United States* v. *Halper*, 490 U. S. 435, 446–449 (1989) (Double Jeopardy Clause prohibits second sanction that may not fairly be characterized as remedial). Conversely, the Fifth Amendment's Self-Incrimination Clause, which is textually limited to "criminal case[s]," has been applied in civil forfeiture proceedings, but only where the forfeiture statute had made the culpability of the owner relevant, see *United States* v. *United States Coin & Currency*, 401 U. S. 715, 721–722 (1971), or where the owner faced the possibility of subsequent criminal proceedings, see *Boyd*, 116 U. S., at 634; see also *United States* v. *Ward*, 448 U. S. 242, 253–254 (1980) (discussing *Boyd*).

And, of course, even those protections associated with criminal cases may apply to a civil forfeiture proceeding if it is so punitive that the proceeding must reasonably be considered criminal. See *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144 (1963); *Ward, supra.*

After deciding to confine the benefits of the Self-Incrimination Clause of the Fifth Amendment to criminal proceedings, the Framers turned their attention to the Eighth Amendment.  There were no proposals to limit that Amendment to criminal proceedings . . . ."  492 U. S., at 294. Section 10 of the English Bill of Rights of 1689 is not expressly limited to criminal cases either.  The original draft of § 10 as introduced in the House of Commons did contain such a restriction, but only with respect to the bail clause: "The requiring excessive Bail of Persons committed in criminal Cases, and imposing excessive Fines, and illegal Punishments, to be prevented."  10 H. C. Jour. 17 (1688).  The absence of any similar restriction in the other two clauses suggests that they were not limited to criminal cases.  In the final version, even the reference to criminal cases in the bail clause was omitted.  See 1 W. & M., 2d Sess., ch. 2, 3 Stat. at Large 441 (1689) ("That excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted"); see also L. Schwoerer, The Declaration of Rights, 1689, p. 88 (1981) ("But article 10 contains no reference to 'criminal cases' and, thus, would seem to apply . . . to all cases").[5]

The purpose of the Eighth Amendment, putting the Bail Clause to one side, was to limit the government's power to punish.  See *Browning-Ferris*, 492 U. S., at 266–267, 275. The Cruel and Unusual Punishments Clause is self-evidently concerned with punishment.  The Excessive Fines Clause limits the government's power to extract payments, whether

---

[5] In *Ingraham* v. *Wright*, 430 U. S. 651 (1977), we concluded that the omission of any reference to criminal cases in § 10 was without substantive significance in light of the preservation of a similar reference to criminal cases in the preamble to the English Bill of Rights.  *Id.*, at 665.  This reference in the preamble, however, related only to excessive bail.  See 1 W. & M., 2d Sess., ch. 2, 3 Stat. at Large 440 (1689).  Moreover, the preamble appears designed to catalog the misdeeds of James II, see *ibid.*, rather than to define the scope of the substantive rights set out in subsequent sections.

in cash or in kind, "as *punishment* for some offense." *Id.*, at 265 (emphasis added). "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." *United States* v. *Halper*, 490 U. S. 435, 447–448 (1989). "It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties." *Id.*, at 447. See also *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 554 (1943) (Frankfurter, J., concurring). Thus, the question is not, as the United States would have it, whether forfeiture under §§ 881(a)(4) and (a)(7) is civil or criminal, but rather whether it is punishment.[6]

In considering this question, we are mindful of the fact that sanctions frequently serve more than one purpose. We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause. We, however, must determine that it can only be explained as serving in part to punish. We said in *Halper* that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." 490 U. S., at 448. We turn, then, to consider whether, at the time the Eighth Amendment was ratified, forfeiture was understood at least in part as punish-

---

[6] For this reason, the United States' reliance on *Kennedy* v. *Mendoza-Martinez* and *United States* v. *Ward* is misplaced. The question in those cases was whether a nominally civil penalty should be reclassified as criminal and the safeguards that attend a criminal prosecution should be required. See *Mendoza-Martinez*, 372 U. S., at 167, 184; *Ward*, 448 U. S., at 248. In addressing the separate question whether punishment is being imposed, the Court has not employed the tests articulated in *Mendoza-Martinez* and *Ward*. See, *e. g.*, *United States* v. *Halper*, 490 U. S., at 447. Since in this case we deal only with the question whether the Eighth Amendment's Excessive Fines Clause applies, we need not address the application of those tests.

ment and whether forfeiture under §§ 881(a)(4) and (a)(7) should be so understood today.

### III

### A

Three kinds of forfeiture were established in England at the time the Eighth Amendment was ratified in the United States: deodand, forfeiture upon conviction for a felony or treason, and statutory forfeiture. See *Calero-Toledo,* 416 U. S., at 680–683. Each was understood, at least in part, as imposing punishment.

> "At common law the value of an inanimate object directly or indirectly causing the accidental death of a King's subject was forfeited to the Crown as a deodand. The origins of the deodand are traceable to Biblical and pre-Judeo-Christian practices, which reflected the view that the instrument of death was accused and that religious expiation was required. See O. Holmes, The Common Law, c. 1 (1881). The value of the instrument was forfeited to the King, in the belief that the King would provide the money for Masses to be said for the good of the dead man's soul, or insure that the deodand was put to charitable uses. 1 W. Blackstone, Commentaries *300. When application of the deodand to religious or eleemosynary purposes ceased, and the deodand became a source of Crown revenue, the institution was justified as a penalty for carelessness." *Id.,* at 680–681 (footnotes omitted).

As Blackstone put it, "such misfortunes are in part owing to the negligence of the owner, and therefore he is properly punished by such forfeiture." 1 W. Blackstone, Commentaries *301.

The second kind of common-law forfeiture fell only upon those convicted of a felony or of treason. "The convicted felon forfeited his chattels to the Crown and his lands es-

cheated to his lord; the convicted traitor forfeited all of his property, real and personal, to the Crown." *Calero-Toledo,* 416 U. S., at 682. Such forfeitures were known as forfeitures of estate. See 4 W. Blackstone, at *381. These forfeitures obviously served to punish felons and traitors, see *The Palmyra,* 12 Wheat. 1, 14 (1827), and were justified on the ground that property was a right derived from society which one lost by violating society's laws, see 1 W. Blackstone, at *299; 4 *id.,* at *382.

Third, "English Law provided for statutory forfeitures of offending objects used in violation of the customs and revenue laws." *Calero-Toledo,* 416 U. S., at 682. The most notable of these were the Navigation Acts of 1660 that required the shipping of most commodities in English vessels. Violations of the Acts resulted in the forfeiture of the illegally carried goods as well as the ship that transported them. See generally L. Harper, English Navigation Laws (1939). The statute was construed so that the act of an individual seaman, undertaken without the knowledge of the master or owner, could result in forfeiture of the entire ship. See *Mitchell* v. *Torup,* Park. 227, 145 Eng. Rep. 764 (Ex. 1766). Yet Blackstone considered such forfeiture statutes "penal." 3 W. Blackstone, at *261.

In *Calero-Toledo,* we observed that statutory forfeitures were "likely a product of the confluence and merger of the deodand tradition and the belief that the right to own property could be denied the wrongdoer." 416 U. S., at 682. Since each of these traditions had a punitive aspect, it is not surprising that forfeiture under the Navigation Acts was justified as a penalty for negligence: "But the Owners of Ships are to take Care what Master they employ, and the Master what Mariners; and here Negligence is plainly imputable to the Master; for he is to report the Cargo of the Ship, and if he had searched and examined the Ship with proper care, according to his Duty, he would have found the Tea . . . and

 

so might have prevented the Forfeiture." *Mitchell*, Park., at 238, 145 Eng. Rep., at 768.

## B

Of England's three kinds of forfeiture, only the third took hold in the United States. "Deodands did not become part of the common-law tradition of this country." *Calero-Toledo*, 416 U. S., at 682. The Constitution forbids forfeiture of estate as a punishment for treason "except during the Life of the Person attainted," U. S. Const., Art. III, § 3, cl. 2, and the First Congress also abolished forfeiture of estate as a punishment for felons. Act of Apr. 30, 1790, ch. 9, § 24, 1 Stat. 117. "But '[l]ong before the adoption of the Constitution the common law courts in the Colonies—and later in the states during the period of Confederation—were exercising jurisdiction *in rem* in the enforcement of [English and local] forfeiture statutes.'" *Calero-Toledo*, 416 U. S., at 683, quoting *C. J. Hendry Co.* v. *Moore*, 318 U. S. 133, 139 (1943).

The First Congress passed laws subjecting ships and cargos involved in customs offenses to forfeiture. It does not follow from that fact, however, that the First Congress thought such forfeitures to be beyond the purview of the Eighth Amendment. Indeed, examination of those laws suggests that the First Congress viewed forfeiture as punishment. For example, by the Act of July 31, 1789, ch. 5, § 12, 1 Stat. 39, Congress provided that goods could not be unloaded except during the day and with a permit.

"[A]nd if the master or commander of any ship or vessel shall suffer or permit the same, such master and commander, and every other person who shall be aiding or assisting in landing, removing, housing, or otherwise securing the same, shall forfeit and pay the sum of four hundred dollars for every offence; shall moreover be disabled from holding any office of trust or profit under the United States, for a term not exceeding seven years; and it shall be the duty of the collector of the district, to

advertise the names of all such persons in the public gazette of the State in which he resides, within twenty days after each respective conviction. And all goods, wares and merchandise, so landed or discharged, shall become forfeited, and may be seized by any officer of the customs; and where the value thereof shall amount to four hundred dollars, the vessel, tackle, apparel and furniture, shall be subject to like forfeiture and seizure."

Forfeiture of the goods and vessel is listed alongside the other provisions for punishment. It is also of some interest that "forfeit" is the word Congress used for fine. See *ibid.* ("shall forfeit and pay the sum of four hundred dollars for every offence").[7] Other early forfeiture statutes follow the same pattern. See, *e. g.*, Act of Aug. 4, 1790, ch. 34, §§ 13, 22, 27, 28, 1 Stat. 157, 161, 163.

### C

Our cases also have recognized that statutory *in rem* forfeiture imposes punishment. In *Peisch* v. *Ware*, 4 Cranch 347 (1808), for example, the Court held that goods removed from the custody of a revenue officer without the payment of duties should not be forfeitable for that reason unless they were removed with the consent of the owner or his agent. Chief Justice Marshall delivered the opinion for a unanimous Court:

"The court is also of opinion that the removal for which the act punishes the owner with a forfeiture of

---

[7] Dictionaries of the time confirm that "fine" was understood to include "forfeiture" and vice versa. See 1 T. Sheridan, A General Dictionary of the English Language (1780) (unpaginated) (defining "fine" as: "A mulct, a pecuniary punishment; penalty; forfeit, money paid for any exemption or liberty"); J. Walker, A Critical Pronouncing Dictionary (1791) (unpaginated) (same); 1 Sheridan, *supra* (defining "forfeiture" as: "The act of forfeiting; the thing forfeited, a mulct, a fine"); Walker, *supra* (same); J. Kersey, A New English Dictionary (1702) (unpaginated) (defining "forfeit" as: "default, fine, or penalty").

the goods must be made with his consent or connivance, or with that of some person employed or trusted by him. If, by private theft, or open robbery, without any fault on his part, his property should be invaded, while in the custody of the officer of the revenue, the law cannot be understood to punish him with the forfeiture of that property." *Id.*, at 364.[8]

The same understanding of forfeiture as punishment runs through our cases rejecting the "innocence" of the owner as a common-law defense to forfeiture. See, *e. g., Calero-Toledo*, 416 U. S., at 683; *J. W. Goldsmith, Jr.-Grant Co.* v. *United States*, 254 U. S. 505 (1921); *Dobbins's Distillery* v. *United States*, 96 U. S. 395 (1878); *Harmony* v. *United States*, 2 How. 210 (1844); *The Palmyra*, 12 Wheat. 1 (1827). In these cases, forfeiture has been justified on two theories—that the property itself is "guilty" of the offense, and that the owner may be held accountable for the wrongs of others to whom he entrusts his property. Both theories rest, at bottom, on the notion that the owner has been negligent in allowing his property to be misused and that he is properly punished for that negligence.

The fiction that "the thing is primarily considered the offender," *Goldsmith-Grant Co.*, 254 U. S., at 511, has a venerable history in our case law.[9] See *The Palmyra*, 12 Wheat.,

---

[8] In *Peisch*, the removal of the goods from the custody of the revenue officer occurred not by theft or robbery, but pursuant to a writ of replevin issued by a state court. See 4 Cranch, at 360. Thus, *Peisch* stands for the general principle that "the law is not understood to forfeit the property of owners or consignees, on account of the misconduct of mere strangers, over whom such owners or consignees could have no control." *Id.*, at 365.

[9] The Government relies heavily on this fiction. See Brief for United States 18. We do not understand the Government to rely separately on the technical distinction between proceedings *in rem* and proceedings *in personam*, but we note that any such reliance would be misplaced. "The fictions of *in rem* forfeiture were developed primarily to expand the reach of the courts," *Republic Nat. Bank of Miami* v. *United States*, 506 U. S.

at 14 ("The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing"); *Harmony*, 2 How., at 233 ("The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner"); *Dobbins's Distillery*, 96 U. S., at 401 ("[T]he offence . . . is attached primarily to the distillery, and the real and personal property used in connection with the same, without any regard whatsoever to the personal misconduct or responsibility of the owner"). Yet the Court has understood this fiction to rest on the notion that the owner who allows his property to become involved in an offense has been negligent. Thus, in *Goldsmith-Grant Co.*, the Court said that "ascribing to the property a certain personality, a power of complicity and guilt in the wrong," had "some analogy to the law of *deodand.*" 254 U. S., at 510. It then quoted Blackstone's explanation of the reason for deodand: that "'such misfortunes are in part owing to the negligence of the owner, and therefore he is properly punished by such forfeiture.'" *Id.*, at 510–511, quoting 1 W. Blackstone, at *301.

In none of these cases did the Court apply the guilty-property fiction to justify forfeiture when the owner had done all that reasonably could be expected to prevent the unlawful use of his property. In *The Palmyra*, it did no more than reject the argument that the criminal conviction of the owner was a prerequisite to the forfeiture of his property. See 12 Wheat., at 15 ("[N]o personal conviction of the offender is necessary to enforce a forfeiture *in rem* in cases of this nature"). In *Harmony*, the owners' claim of "innocence" was limited to the fact that they "never contemplated

---

80, 87 (1992), which, particularly in admiralty proceedings, might have lacked *in personam* jurisdiction over the owner of the property. See also *Harmony* v. *United States*, 2 How. 210, 233 (1844). As is discussed in the text, forfeiture proceedings historically have been understood as imposing punishment despite their *in rem* nature.

or authorized the acts complained of." 2 How., at 230. And in *Dobbins's Distillery*, the Court noted that some responsibility on the part of the owner arose "from the fact that he leased the property to the distiller, and suffered it to be occupied and used by the lessee as a distillery." 96 U. S., at 401. The more recent cases have expressly reserved the question whether the fiction could be employed to forfeit the property of a truly innocent owner. See, *e. g.*, *Goldsmith-Grant Co.*, 254 U. S., at 512; *Calero-Toledo*, 416 U. S., at 689–690 (noting that forfeiture of a truly innocent owner's property would raise "serious constitutional questions").[10] If forfeiture had been understood not to punish the owner, there would have been no reason to reserve the case of a truly innocent owner. Indeed, it is only on the assumption that forfeiture serves in part to punish that the Court's past reservation of that question makes sense.

The second theory on which the Court has justified the forfeiture of an "innocent" owner's property is that the owner may be held accountable for the wrongs of others to whom he entrusts his property. In *Harmony*, it reasoned that "the acts of the master and crew, in cases of this sort, bind the interest of the owner of the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." 2 How., at 234. It repeated this reasoning in *Dobbins's Distillery:*

> "[T]he unlawful acts of the distiller bind the owner of the property, in respect to the management of the same, as much as if they were committed by the owner himself. Power to that effect the law vests in him by virtue of his lease; and, if he abuses his trust, it is a matter to be settled between him and his lessor; but the acts of viola-

---

[10] Because the forfeiture provisions at issue here exempt "innocent owners," we again have no occasion to decide in this case whether it would comport with due process to forfeit the property of a truly innocent owner.

tion as to the penal consequences to the property are to be considered just the same as if they were the acts of the owner." 96 U. S., at 404.

Like the guilty-property fiction, this theory of vicarious liability is premised on the idea that the owner has been negligent. Thus, in *Calero-Toledo*, we noted that application of forfeiture provisions "to lessors, bailors, or secured creditors who are innocent of any wrongdoing . . . may have the desirable effect of inducing them to exercise greater care in transferring possession of their property." 416 U. S., at 688.[11]

In sum, even though this Court has rejected the "innocence" of the owner as a common-law defense to forfeiture, it consistently has recognized that forfeiture serves, at least in part, to punish the owner. See *Peisch* v. *Ware*, 4 Cranch, at 364 ("[T]he act punishes the owner with a forfeiture of the goods"); *Dobbins's Distillery*, 96 U. S., at 404 ("[T]he acts of violation as to the penal consequences to the property are to be considered just the same as if they were the acts of the owner"); *Goldsmith-Grant Co.*, 254 U. S., at 511 ("'[S]uch misfortunes are in part owing to the negligence of the owner, and therefore he is properly punished by such forfeiture'"). More recently, we have noted that forfeiture serves "punitive and deterrent purposes," *Calero-Toledo*, 416 U. S., at 686, and "impos[es] an economic penalty," *id.*, at 687. We conclude, therefore, that forfeiture generally and statutory *in rem* forfeiture in particular historically have been understood, at least in part, as punishment.[12]

---

[11] In the criminal context, we have permitted punishment in the absence of conscious wrongdoing, so long as the defendant was not "'powerless' to prevent or correct the violation." *United States* v. *Park*, 421 U. S. 658, 673 (1975) (corporate officer strictly liable under the Food, Drug, and Cosmetic Act). There is nothing inconsistent, therefore, in viewing forfeiture as punishment even though the forfeiture is occasioned by the acts of a person other than the owner.

[12] The doubts that JUSTICE SCALIA, see *post*, at 625–627, and JUSTICE KENNEDY, see *post*, at 629, express with regard to the historical understanding of forfeiture as punishment appear to stem from a misunder-

## IV

We turn next to consider whether forfeitures under 21 U. S. C. §§ 881(a)(4) and (a)(7) are properly considered punishment today. We find nothing in these provisions or their legislative history to contradict the historical understanding of forfeiture as punishment. Unlike traditional forfeiture statutes, §§ 881(a)(4) and (a)(7) expressly ·provide an "innocent owner" defense. See § 881(a)(4)(C) ("[N]o conveyance shall be forfeited under this paragraph to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of the owner"); § 881(a)(7) ("[N]o property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner"); see also *United States* v. *Parcel of Rumson, N. J., Land,* 507 U. S. 111, 122–123 (1993) (plurality opinion) (noting difference from traditional forfeiture statutes). These exemptions serve to focus the provisions on the culpability of the owner in a way that makes them look more like punishment, not less. In *United States* v. *United States Coin & Currency,* 401 U. S. 715 (1971), we reasoned that 19 U. S. C. § 1618, which provides that the Secretary of the Treasury is to return the property of those who do not intend to violate the law, demonstrated Congress' intent "to impose a penalty only upon those who are significantly involved in a criminal enterprise." 401 U. S., at 721–722. The inclusion of innocent-owner defenses in §§ 881(a)(4) and (a)(7) reveals a similar congressional intent to punish only those involved in drug trafficking.

---

standing of the relevant question. Under *United States* v. *Halper,* 490 U. S. 435, 448 (1989), the question is whether forfeiture serves *in part* to punish, and one need not exclude the possibility that forfeiture serves other purposes to reach that conclusion.

Furthermore, Congress has chosen to tie forfeiture directly to the commission of drug offenses. Thus, under § 881(a)(4), a conveyance is forfeitable if it is used or intended for use to facilitate the transportation of controlled substances, their raw materials, or the equipment used to manufacture or distribute them. Under § 881(a)(7), real property is forfeitable if it is used or intended for use to facilitate the commission of a drug-related crime punishable by more than one year's imprisonment. See n. 1, *supra.*

The legislative history of § 881 confirms the punitive nature of these provisions. When it added subsection (a)(7) to § 881 in 1984, Congress recognized "that the traditional criminal sanctions of fine and imprisonment are inadequate to deter or punish the enormously profitable trade in dangerous drugs." S. Rep. No. 98–225, p. 191 (1983).[13] It characterized the forfeiture of real property as "a powerful deterrent." *Id.,* at 195. See also Joint House-Senate Explanation of Senate Amendment to Titles II and III of the Psychotropic Substances Act of 1978, 124 Cong. Rec. 34671 (1978) (noting "the penal nature of forfeiture statutes").

The Government argues that §§ 881(a)(4) and (a)(7) are not punitive but, rather, should be considered remedial in two respects. First, they remove the "instruments" of the drug trade "thereby protecting the community from the threat of continued drug dealing." Brief for United States 32. Second, the forfeited assets serve to compensate the Government for the expense of law enforcement activity and for its expenditure on societal problems such as urban blight, drug addiction, and other health concerns resulting from the drug trade. *Id.,* at 25, 32.

---

[13] Although the United States omits any reference to this legislative history in its brief in the present case, it quoted the same passage with approval in its brief in *United States* v. *Parcel of Rumson, N. J., Land,* 507 U. S. 111 (1993). See Brief for United States, O. T. 1992, No. 91–781, pp. 41–42.

In our view, neither argument withstands scrutiny. Concededly, we have recognized that the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society. See *United States v. One Assortment of 89 Firearms*, 465 U. S. 354, 364 (1984). The Court, however, previously has rejected government's attempt to extend that reasoning to conveyances used to transport illegal liquor. See *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U. S. 693, 699 (1965). In that case it noted: "There is nothing even remotely criminal in possessing an automobile." *Ibid.* The same, without question, is true of the properties involved here, and the Government's attempt to characterize these properties as "instruments" of the drug trade must meet the same fate as Pennsylvania's effort to characterize the 1958 Plymouth sedan as "contraband."

The Government's second argument about the remedial nature of this forfeiture is no more persuasive. We previously have upheld the forfeiture of goods involved in customs violations as "a reasonable form of liquidated damages." *One Lot Emerald Cut Stones v. United States*, 409 U. S. 232, 237 (1972). But the dramatic variations in the value of conveyances and real property forfeitable under §§ 881(a)(4) and (a)(7) undercut any similar argument with respect to those provisions. The Court made this very point in *Ward:* The "forfeiture of property . . . [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law." 448 U. S., at 254.

Fundamentally, even assuming that §§ 881(a)(4) and (a)(7) serve some remedial purpose, the Government's argument must fail. "[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Halper*, 490 U. S., at 448 (emphasis added). In light of the historical understanding of forfeiture as punishment, the

clear focus of §§ 881(a)(4) and (a)(7) on the culpability of the owner, and the evidence that Congress understood those provisions as serving to deter and to punish, we cannot conclude that forfeiture under §§ 881(a)(4) and (a)(7) serves solely a remedial purpose.[14] We therefore conclude that forfeiture under these provisions constitutes "payment to a sovereign as punishment for some offense," *Browning-Ferris*, 492 U. S., at 265, and, as such, is subject to the limitations of the Eighth Amendment's Excessive Fines Clause.

## V

Austin asks that we establish a multifactor test for determining whether a forfeiture is constitutionally "excessive." See Brief for Petitioner 46–48. We decline that invitation. Although the Court of Appeals opined that "the government is exacting too high a penalty in relation to the offense committed," 964 F. 2d, at 818, it had no occasion to consider what factors should inform such a decision because it thought it was foreclosed from engaging in the inquiry. Prudence dictates that we allow the lower courts to consider that question

---

[14] In *Halper*, we focused on whether "the sanction as applied in the individual case serves the goals of punishment." 490 U. S., at 448. In this case, however, it makes sense to focus on §§ 881(a)(4) and (a)(7) as a whole. *Halper* involved a small, fixed-penalty provision, which "in the ordinary case . . . can be said to do no more than make the Government whole." *Id.*, at 449. The value of the conveyances and real property forfeitable under §§ 881(a)(4) and (a)(7), on the other hand, can vary so dramatically that any relationship between the Government's actual costs and the amount of the sanction is merely coincidental. See *Ward*, 448 U. S., at 254. Furthermore, as we have seen, forfeiture statutes historically have been understood as serving not simply remedial goals but also those of punishment and deterrence. Finally, it appears to make little practical difference whether the Excessive Fines Clause applies to all forfeitures under §§ 881(a)(4) and (a)(7) or only to those that cannot be characterized as purely remedial. The Clause prohibits only the imposition of "excessive" fines, and a fine that serves purely remedial purposes cannot be considered "excessive" in any event.

in the first instance. See *Yee* v. *Escondido*, 503 U. S. 519, 538 (1992).[15]

The judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

We recently stated that, at the time the Eighth Amendment was drafted, the term "fine" was "understood to mean a payment to a sovereign as punishment for some offense." *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 265 (1989). It seems to me that the Court's opinion obscures this clear statement, and needlessly attempts to derive from our sparse case law on the subject of *in rem* forfeiture the questionable proposition that the owner of property taken pursuant to such forfeiture is always blameworthy. I write separately to explain why I consider this forfeiture a fine, and to point out that the excessiveness inquiry for statutory *in rem* forfeitures is different from the usual excessiveness inquiry.

I

Whether any sort of forfeiture of property may be covered by the Eighth Amendment is not a difficult question. "Forfeiture" and "fine" each appeared as one of many definitions of the other in various 18th-century dictionaries. See *ante,* at 614, n. 7. "Payment," the word we used in *Browning-*

---

[15] JUSTICE SCALIA suggests that the sole measure of an *in rem* forfeiture's excessiveness is the relationship between the forfeited property and the offense. See *post,* at 627–628. We do not rule out the possibility that the connection between the property and the offense may be relevant, but our decision today in no way limits the Court of Appeals from considering other factors in determining whether the forfeiture of Austin's property was excessive.

*Ferris* as a synonym for fine, certainly includes in-kind assessments. Webster's New International Dictionary 1797 (2d ed. 1950) (defining "payment" as "[t]hat which is paid; the thing given to discharge a debt or an obligation"). Moreover, for the Eighth Amendment to limit cash fines while permitting limitless in-kind assessments would make little sense, altering only the form of the Star Chamber abuses that led to the provision of the English Bill of Rights, from which our Excessive Fines Clause directly derives, see *Browning-Ferris, supra,* at 266–267. Cf. *Harmelin* v. *Michigan,* 501 U. S. 957, 978–979, n. 9 (1991) (opinion of SCALIA, J.). In *Alexander* v. *United States, ante,* at 558, we have today held that an *in personam* criminal forfeiture is an Eighth Amendment "fine."

In order to constitute a fine under the Eighth Amendment, however, the forfeiture must constitute "punishment," and it is a much closer question whether statutory *in rem* forfeitures, as opposed to *in personam* forfeitures, meet this requirement. The latter are assessments, whether monetary or in kind, to punish the property owner's criminal conduct, while the former are confiscations of property rights based on improper use of the property, regardless of whether the owner has violated the law. Statutory *in rem* forfeitures have a long history. See generally *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663, 680–686 (1974). The property to which they apply is not contraband, see the forfeiture Act passed by the First Congress, *ante,* at 613–614, nor is it necessarily property that can only be used for illegal purposes. The theory of *in rem* forfeiture is said to be that the lawful property has committed an offense. See, *e. g., The Palmyra,* 12 Wheat. 1, 14–15 (1827) (forfeiture of vessel for piracy); *Harmony* v. *United States,* 2 How. 210, 233–234 (1844) (forfeiture of vessel, but not cargo, for piracy); *Dobbins's Distillery* v. *United States,* 96 U. S. 395, 400–403 (1878) (forfeiture of distillery and real property for evasion of revenue laws); *J. W. Goldsmith, Jr.-Grant Co.* v. *United*

*States,* 254 U. S. 505, 510–511 (1921) (forfeiture of goods concealed to avoid taxes).

However the theory may be expressed, it seems to me that this taking of lawful property must be considered, in whole or in part, see *United States* v. *Halper,* 490 U. S. 435, 448 (1989), punitive.* Its purpose is not compensatory, to make someone whole for injury caused by unlawful use of the property. See *ibid.* Punishment is being imposed, whether one quaintly considers its object to be the property itself, or more realistically regards its object to be the property's owner. This conclusion is supported by Blackstone's observation that even confiscation of a deodand, whose religious origins supposedly did not reflect any punitive motive but only expiation, see Law of Deodands, 34 Law Mag. 188, 189 (1845), came to be explained in part by reference to the owner as well as to the offending property. 1 W. Blackstone, Commentaries *301; accord, Law of Deodands, *supra,* at 190. Our cases have described statutory *in rem* forfeiture as "likely a product of the confluence and merger of the deodand tradition and the belief that the right to own property could be denied the wrongdoer." *Calero-Toledo, supra,* at 682.

The Court apparently believes, however, that only actual culpability of the affected property owner can establish that a forfeiture provision is punitive, and sets out to establish (in Part III) that such culpability exists in the case of *in rem* forfeitures. In my view, however, the case law is far more ambiguous than the Court acknowledges. We have never held that the Constitution requires negligence, or any other degree of culpability, to support such forfeitures. See *ante,*

---

*Thus, contrary to the Court's contention, *ante,* at 618–619, n. 12, I agree with it on this point. I do not agree, however, that culpability of the property owner is necessary to establish punitiveness, or that punitiveness "in part" is established by showing that at least in *some* cases the affected property owners are culpable. That is to say, the statutory forfeiture must *always* be at least "partly punitive," or else it is not a fine. See *ante,* at 622, n. 14.

at 616–617, and n. 10; *Goldsmith-Grant, supra,* at 512 (reserving question); *Calero-Toledo, supra,* at 689–690 (same). A prominent 19th-century treatise explains statutory *in rem* forfeitures solely by reference to the fiction that the property is guilty, strictly separating them from forfeitures that require a personal offense of the owner. See 1 J. Bishop, Commentaries on Criminal Law §§ 816, 824, 825, 833 (7th ed. 1882). If the Court is correct that culpability of the owner is essential, then there is no difference (except perhaps the burden of proof) between the traditional *in rem* forfeiture and the traditional *in personam* forfeiture. Well-established common-law distinctions should not be swept away by reliance on bits of dicta. Moreover, if some degree of personal culpability on the part of the property owner always exists for *in rem* forfeitures, see *ante,* at 614–618, then it is hard to understand why this Court has kept reserving the (therefore academic) question whether personal culpability is constitutionally required, see *ante,* at 617, as the Court does again today, see *ante,* at 617, n. 10.

I would have reserved the question without engaging in the misleading discussion of culpability. *Even if* punishment of personal culpability is necessary for a forfeiture to be a fine; and *even if in rem* forfeitures in general do not punish personal culpability; the *in rem* forfeiture in *this* case is a fine. As the Court discusses in Part IV, this statute, in contrast to the traditional *in rem* forfeiture, *requires* that the owner not be innocent—that he have some degree of culpability for the "guilty" property. See also *United States* v. *Parcel of Rumson, N. J., Land,* 507 U. S. 111, 121–123 (1993) (plurality opinion) (contrasting drug forfeiture statute with traditional statutory *in rem* forfeitures). Here, the property must "offend" *and* the owner must not be completely without fault. Nor is there any consideration of compensating for loss, since the value of the property is irrelevant to whether it is forfeited. That is enough to satisfy the *Browning-Ferris* standard, and to make the entire discussion

in Part III dictum. Statutory forfeitures under § 881(a) are certainly *payment* (in kind) *to a sovereign* as *punishment* for an *offense.*

## II

That this forfeiture works as a fine raises the excessiveness issue, on which the Court remands. I agree that a remand is in order, but think it worth pointing out that on remand the excessiveness analysis must be different from that applicable to monetary fines and, perhaps, to *in personam* forfeitures. In the case of a monetary fine, the Eighth Amendment's origins in the English Bill of Rights, intended to limit the abusive penalties assessed against the King's opponents, see *Browning-Ferris,* 492 U. S., at 266–267, demonstrate that the touchstone is value of the fine in relation to the offense. And in *Alexander* v. *United States,* we indicated that the same is true for *in personam* forfeiture. *Ante,* at 558.

Here, however, the offense of which petitioner has been convicted is not relevant to the forfeiture. Section § 881 requires only that the Government show probable cause that the subject property was used for the prohibited purpose. The burden then shifts to the property owner to show, by a preponderance of the evidence, that the use was made without his "knowledge, consent, or willful blindness," 21 U. S. C. § 881(a)(4)(C), see also § 881(a)(7), or that the property was not so used, see § 881(d) (incorporating 19 U. S. C. § 1615). Unlike monetary fines, statutory *in rem* forfeitures have traditionally been fixed, not by determining the appropriate value of the penalty in relation to the committed offense, but by determining what property has been "tainted" by unlawful use, to which issue the value of the property is irrelevant. Scales used to measure out unlawful drug sales, for example, are confiscable whether made of the purest gold or the basest metal. But an *in rem* forfeiture goes beyond the traditional limits that the Eighth Amendment permits if it applies to property that cannot properly be regarded as an instrumen-

tality of the offense—the building, for example, in which an isolated drug sale happens to occur. Such a confiscation would be an excessive fine. The question is not *how much* the confiscated property is worth, but *whether* the confiscated property has a close enough relationship to the offense.

This inquiry for statutory forfeitures has common-law parallels. Even in the case of deodands, juries were careful to confiscate only the instrument of death and not more. Thus, if a man was killed by a moving cart, the cart and its horses were deodands, but if the man died when he fell from a wheel of an immobile cart, only the wheel was treated as a deodand, since only the wheel could be regarded as the cause of death. 1 M. Hale, Pleas of the Crown *419–*422; 1 W. Blackstone, Commentaries *301–*302; Law of Deodands, 34 Law Mag., at 190. Our cases suggest a similar instrumentality inquiry when considering the permissible scope of a statutory forfeiture. Cf. *Goldsmith-Grant*, 254 U. S., at 510, 513; *Harmony*, 2 How., at 235 (ship used for piracy is forfeited, but cargo is not). The relevant inquiry for an excessive forfeiture under § 881 is the relationship of the property to the offense: Was it close enough to render the property, under traditional standards, "guilty" and hence forfeitable?

I join the Court's opinion in part, and concur in the judgment.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, concurring in part and concurring in the judgment.

I am in substantial agreement with Part I of JUSTICE SCALIA's opinion concurring in part and concurring in the judgment. I share JUSTICE SCALIA's belief that Part III of the Court's opinion is quite unnecessary for the decision of the case, fails to support the Court's argument, and seems rather doubtful as well.

In recounting the law's history, we risk anachronism if we attribute to an earlier time an intent to employ legal con-

cepts that had not yet evolved. I see something of that in the Court's opinion here, for in its eagerness to discover a unified theory of forfeitures, it recites a consistent rationale of personal punishment that neither the cases nor other narratives of the common law suggest. For many of the reasons explained by JUSTICE SCALIA, I am not convinced that all *in rem* forfeitures were on account of the owner's blameworthy conduct. Some impositions of *in rem* forfeiture may have been designed either to remove property that was itself causing injury, see, *e. g., Harmony* v. *United States,* 2 How. 210, 233 (1844), or to give the court jurisdiction over an asset that it could control in order to make injured parties whole, see *Republic Nat. Bank of Miami* v. *United States,* 506 U. S. 80, 87 (1992).

At some point, we may have to confront the constitutional question whether forfeiture is permitted when the owner has committed no wrong of any sort, intentional or negligent. That for me would raise a serious question. Though the history of forfeiture laws might not be determinative of that issue, it would have an important bearing on the outcome. I would reserve for that or some other necessary occasion the inquiry the Court undertakes here. Unlike JUSTICE SCALIA, see *ante,* at 625, I would also reserve the question whether *in rem* forfeitures always amount to an intended punishment of the owner of forfeited property.

With these observations, I concur in part and concur in the judgment.