UNITED STATES of America,
Plaintiff–Appellant,

v.

1990 TOYOTA 4RUNNER,
Defendant–Appellee.

No. 92–3709.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1993.

Decided Nov. 16, 1993.

Jack Donatelli, Asst. Atty. Gen., Office of the U.S. Atty., Civ. Div., Appellate Section, Chicago, IL (argued), for plaintiff-appellant.

William T. Huyck (argued), Thomas J. Shanahan, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, and CUMMINGS and CUDAHY, Circuit Judges.

POSNER, Chief Judge.

This appeal by the United States requires us to interpret 21 U.S.C. § 881, which subjects property used in federal drug offenses to forfeiture. The government filed a complaint to forfeit a 1990 Toyota 4Runner seized in the following circumstances. Abiodun Oloko wanted to import two kilograms of heroin from the Philippines. He needed someone to go to Manila to pick up the drugs. The person he approached was, unbeknownst to him, an undercover agent of the Drug Enforcement Administration. On September 9, 1991, Oloko met with the agent and other conspirators in a Chicago restaurant. At the meeting, which lasted from 4:10 to 4:40 p.m., Oloko instructed the agent to obtain a passport and agreed to pay him $10,000 for transporting the heroin from Manila to Chicago. Oloko drove to and from the meeting in the 1990 Toyota 4Runner. The agent flew to Manila and on November 1,

1991, as arranged with Oloko, picked up a suitcase containing two kilograms of heroin. On the basis of the events we have narrated, Oloko pleaded guilty to conspiracy to import a controlled substance illegally. In response to the forfeiture complaint he and another person filed a claim of ownership and moved successfully to dismiss the complaint on the ground that the use of the automobile fell outside the scope of the forfeiture statute.

■ The statute provides for the forfeiture of controlled substances, raw materials used in their manufacture, cash, drug paraphernalia, firearms, real estate, records, equipment, and "conveyances" (including aircraft and boats), when these things are used in federal drug offenses, except to the extent that an innocent person has an interest in the property in question. Our concern is with the conveyances provision, 21 U.S.C. § 881(a)(4), which covers all conveyances "which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of" controlled substances or the equipment or raw materials used to make controlled substances. A vehicle or other conveyance used to transport the drugs is forfeitable by virtue of the "to transport" clause, but Oloko's Toyota is forfeitable if at all only if it can be said to have been "used, or ... intended for use, ... in any manner to facilitate the transportation, sale, receipt, possession, or concealment of" the heroin that Oloko ordered from Manila.

In order to import the heroin into the United States and place it in Oloko's possession, someone had to go to Manila, get it, and bring it back. In order for someone to go to Manila for this purpose, arrangements for the trip had to be made, including arrangements for procuring a passport for the courier (if he didn't have one already) and for compensating him. In order to make these arrangements, the conspirators had to meet, and Oloko's presence at the meeting was "facilitated" by the Toyota, his mode of conveyance to and from the meeting. In facilitating the meeting, the Toyota facilitated a later transportation of the heroin to, and its receipt and possession by, Oloko. The charge of importation encompassed transportation. Cf. *United States v. One Gates Learjet*, 861 F.2d 868, 871 (5th Cir.1988).

■ It does not appear that the heroin was actually brought to the United States, let alone received by Oloko; but we do not think this matters. The words "intended for use" seem designed not merely for the unusual case of the aborted use (Oloko might have had a flat tire en route to the meeting and missed it), but also and more centrally for the aborted conspiracy. His intention (goal, purpose, desire, object) in using the Toyota to drive to the meeting was to facilitate the transportation of heroin to Chicago, but his intention was thwarted.

At argument his lawyer conceded that if a sale had taken place at the meeting, the automobile would be forfeitable. This was a damaging concession. The statute is not limited to conveyances used to facilitate a sale. It extends to conveyances used to facilitate transportation, receipt, or possession. No doubt what the lawyer meant was that the transportation, receipt, possession, or sale (or concealment) has to occur at the meeting or other encounter to which the conveyance conveys the drug offender. His position was that if all that goes on at the meeting or encounter is a discussion of future plans, the facilitative effect of the vehicle or other conveyance is too remote to come within the statute's reach.

■ The district judge's ground for thinking the statute inapplicable was broader. He thought the term "facilitate" connotes causation. To label one thing a "cause" of another is, in criminal as in tort law, ordinarily to imply not only that the second would not have occurred but for the first, but also that the first made the second more likely to occur. Suppose that through the negligence of a taxi company a person misses his plane and has to take a later one. The later plane crashes, and he is killed. The taxi company's negligence would not be deemed a cause of his death, even though he would not have died had the company gotten him to the earlier plane, because that negligence made it no more likely that the later plane would crash. *Central of Georgia Ry. v. Price*, 106

Ga. 176, 32 S.E. 77 (1898); *Berry v. Sugar Notch Borough,* 191 Pa. 345, 43 Atl. 240 (1899). Likewise, since Oloko could equally well have gotten to and from the restaurant by some alternative means, such as a taxi, his use of the Toyota could not be said to be a cause of the meeting or of anything that took place at it. This ground for the dismissal of the government's suit is inconsistent with Oloko's concession that the Toyota would be forfeitable if drugs had changed hands at the meeting. For it implies that the availability of equally good alternative means of conveyance to and from the meeting establishes that the Toyota had not been used to facilitate the meeting or anything that might have gone on there, including an actual sale of illegal drugs.

We do not see any warrant for these narrowing interpretations of the statute. The obvious purpose of the statute read as a whole is to deprive drug traffickers of the principal tools of their trade, which include the drugs themselves, the equipment and raw materials for their manufacture, the firearms used to enforce contracts in an illegal business, the premises used for making and selling drugs—and the vehicles, boats, and aircraft that the traffickers use in their business. No doubt they could use public transportation exclusively—public transportation *is* used extensively for the importation and other transportation of illegal drugs already. But taking away their cars, boats, and planes, like taking away their stash houses and guns, is bound to cramp their style. Yet this might be impossible to prove in a particular case. The main effect of depriving drug traffickers of the tools of their trade is to curtail their activities rather than to eliminate them altogether, and normally it would be unknowable whether a particular transaction would have occurred or been attempted had the traffickers been relegated to public transportation. Forget buses, trains, commercial airlines, and taxis: unless the drugs themselves were to be conveyed in a vehicle altered to facilitate concealment, it would be impossible to prove that the drug dealer could not have used a rental car instead of his own car.

So the causal test, the test implied by the district court's analysis, would make the statute impotent, by requiring proof of what is impossible to prove, that it was essential that the offender use his car (or boat or airplane) rather than a rental car or public transportation. While the only mention of the conveyances provision in the legislative history is of the transport clause, not the facilitate clause, H.R.Rep. No. 1444, 91st Cong., 2d Sess., pt. 1, at p. 55 (1970), a silent legislative history does not license us to read a clause out of a statute, which would be the practical consequence of the district judge's approach.

Oloko's suggested test is no better. It draws an arbitrary distinction between the meeting at which the plot is hatched and the meeting at which the drugs change hands. Either type of meeting is essential to the commission of the offense. Even the distinction between the two types is blurry. It appears that at the meeting Oloko and the courier made an executory contract for the transportation of the heroin from the Philippines to the United States. That is the transport equivalent of an executory contract for a sale, and it is common to refer to an executory contract of sale as the "sale" and the consummation of the sale as the "delivery."

All this is not to say that the statute requires the automatic forfeiture of every drug dealer's car. The car must be used in his business to come within the statute's scope. If he just uses it to haul groceries he is not using it to facilitate the transportation, sale, etc. of drugs. It is true that if he didn't eat he would be too weak to do drug deals, so that, by "facilitating" his eating, the car in which he buys groceries could be said to facilitate his drug dealing. It is equally true that if the government took away his clothes and his residence, his drug dealing would be curtailed even more effectively than by the confiscation of the tools of his trade. But the reach of a statute is rarely coextensive with its rationale. The chain that connects eating breakfast with trafficking in drugs is too long, because it takes the requirement that the car be used or intended to be used in specified ways right out of the statute. The place to break the chain is between personal

use unrelated to drugs and business (drug business) use. Oloko used the Toyota in his drug business and by doing so facilitated the attempted transportation, receipt, and possession of illegal drugs, thus bringing the car within the statute's grasp.

The approach we have sketched is consistent with most of the cases. E.g., *One Blue 1977 AMC Jeep CJ–5 v. United States,* 783 F.2d 759 (8th Cir.1986); *United States v. One 1979 Porsche Coupe,* 709 F.2d 1424 (11th Cir.1983) (per curiam); *United States v. One 1979 Mercury Cougar XR–7,* 666 F.2d 228 (5th Cir.1982); *United States v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421 (2d Cir.1977). The First Circuit, however, insists that the conveyance be used *before* the actual offense—after is not enough—and so it refused to decree forfeiture in a case in which a drug dealer's car was used to obtain repayment of drug "front money" two weeks after the sale had gone through. *United States v. One 1972 Chevrolet Corvette,* 625 F.2d 1026, 1029–30 (1st Cir.1980). We do not understand the temporal distinction; surely the getaway driver in a robbery facilitates the robbery even though his work begins when the robbery is complete. Cf. *United States v. Sampson,* 371 U.S. 75, 80, 83 S.Ct. 173, 176, 9 L.Ed.2d 136 (1962); *United States v. Ashman,* 979 F.2d 469, 481–83 (7th Cir. 1992). The Eighth Circuit carved out a category of "incidental" uses of conveyances in a case in which the defendant had driven his pickup truck on a single inspection tour of his field of marijuana. *United States v. One 1976 Ford F–150 Pick–Up,* 769 F.2d 525 (8th Cir.1985) (per curiam). We do not understand that distinction either. The language "or in any manner to facilitate" indicates that Congress did not want the courts to use their ingenuity to trim the statute to "reasonable" proportions. The cases from the First and Eighth Circuits are in any event distinguishable from ours; the meeting here took place before the completion of the offense and Oloko's attendance at it could not be considered incidental. We add that Oloko does not argue that the confiscation of his equity interest in the Toyota inflicted upon him a punishment so disproportionate to his crime as to constitute cruel and unusual punishment in violation of the Eighth Amendment.

Cf. *Austin v. United States,* —— U.S. ——, ——–——, 113 S.Ct. 2801, 2810–12, 125 L.Ed.2d 488 (1993).

The judgment is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, concurring.

For better or for worse, it has become increasingly difficult to impose any principled constraints on the exercise of forfeiture powers under the drug laws. *But see United States v. 92 Buena Vista Avenue,* —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993) (innocent owner defense available to purchaser of house who was given the purchase money as a gift, not knowing that the proceeds derived from narcotics trafficking); *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (Eighth Amendment's excessive fines clause applies to drug forfeitures). My guess is that Congress, in subjecting to forfeiture all "conveyances" used "in any manner to facilitate the transportation, receipt, possession or concealment" of drugs, 21 U.S.C. § 881(a)(4), originally intended the forfeiture of vehicles used for the actual transportation of drugs. For example, the House Committee Report accompanying the original Section 881 indicated that "all conveyances used, or intended for use, to transport or conceal such violative property" would be "subject to forfeiture." H.R.Rep. No. 1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4566, 4623. On this view, "the conveyance could only be forfeit when used or intended for use in transporting or storing the illegal drugs." James B. Speta, Note, *Narrowing the Scope of Civil Drug Forfeiture: Section 881, Substantial Connection and the Eighth Amendment,* 89 Mich.L.Rev. 165, 176 (1990). Thus, "an automobile which drug dealers used for transportation to negotiations would not be forfeitable." *Id. See also* United States Department of Justice, Criminal Division, Asset Forfeiture Office, *Asset Forfeiture: Compilation of Civil Statutes* 211–13 (1987) ("Section 881(a)(4) allows the forfeiture of any conveyance used to

transport any controlled substance that has been unlawfully manufactured, distributed, dispensed or acquired.... [T]he more remote the connection between the conveyance and the illegal activity, the less likely it is that the property is subject to forfeiture.").

But despite all of this, for some time now the statute has been extended to vehicles used to transport participants to the scene of drug transactions, even when the vehicles neither carried nor concealed any drugs. *See United States v. Fleming,* 677 F.2d 602 (7th Cir.1982). *See also United States v. One 1989 Stratford Fairmont,* 986 F.2d 177, 179 (7th Cir.1993) (suggesting that "semitrailers, Indy cars, tanks, chariots, buggies, snowmobiles, riding lawn mowers and entries in a Soapbox Derby" are all "conveyances" subject to forfeiture under § 881(a)(4)). Today we conclude that Section 881 reaches vehicles used to take (or, more precisely, where there is probable cause to believe that the vehicle is used to take) conspirators to meetings where prospective drug deals will be discussed. Unless the Supreme Court interprets § 881 to require some closer and clearer nexus between the drug transaction and the forfeited property, I suppose the next case will be an automobile carrying two drug dealers to a vacation in the mountains with the dealers carrying on a conversation about the prospects for drug transactions as they speed down the highway. After that perhaps one drug dealer driving alone thinking about drugs will be enough. In fact, when asked about this possibility at oral argument, the Assistant United States Attorney suggested that the only difficulty presented by this scenario would be evidentiary: "When you are dealing with thought processes, I'm not exactly sure how the United States would be able to prove such a case."

All this may be to the good, for, as the majority notes, it involves the confiscation of the tools of the nefarious drug trade. The majority also suggests that these seizures will curtail drug trafficking. Hopefully, this will be the case although hard evidence will be exceedingly difficult to come by. The seizures do appear, at any rate, to help cover the costs of carrying on the War on Drugs. *See* United States Department of Justice, *Annual Report of the Department of Justice Asset Forfeiture Program* 31 (1990) (during fiscal year 1990 the Justice Department Asset Forfeiture Fund received deposits of $460 million from federal forfeiture statutes) (cited in Brief for the United States, *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)).

But with respect to the line being drawn today, I am afraid I am skeptical of any durable distinction between "business" and "personal" use of vehicles by drug dealers. Even on vacation or going to the movies, dealers may be on the lookout for business. In separating the "business" from the "personal", I imagine that today's decision suggests a drug dealer's car is subject to forfeiture if its use relates in an "ordinary and necessary" way to the drug venture. This is hardly a bright line rule, for at least in deciphering the tax code, we have learned that this language can be slippery. *Compare* 28 U.S.C. § 162; *Welch v. Helvering,* 290 U.S. 111, 114, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933) (Cardozo, J.) ("ordinary" means "common and accepted" in "the life of the group, the community" of which the individual "is a part"); *Meiers v. Commissioner of Internal Revenue,* 782 F.2d 75 (7th Cir.1986) (per curiam) (allowing a deduction for a home office even where that office is not the "focal point" of the business).

The problem of properly defining the scope of the forfeiture laws is a serious one not so much as it relates specifically to the narcotics trade but as it may impact upon the administration of the criminal law in general. In modern times, forfeiture has not played a prominent role in our criminal jurisprudence. *See 92 Buena Vista,* —— U.S. at ——, 113 S.Ct. at 1133 (describing the modern evolution of forfeiture laws as "an important expansion of governmental power"). There seem to have been good reasons for this, notably a concern about the completely arbitrary exercise of government power. By decisions such as the one today, for better or for worse, we are changing the traditional course of our law.