**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

  v.

MARIA FERRO,
  *Claimant-Appellee,*
  and

ROBERT FERRO,
  *Claimant,*
  and

1,679 FIREARMS; 87,983 ROUNDS OF
AMMUNITION; 3 AIRBURST
PROJECTILES; ASSORTED FUSES,
  *Defendants.*

No. 10-55734
D.C. No.
2:06-cv-05014-PJW

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.

MARIA FERRO,
  *Claimant-Appellant,*
  and

ROBERT FERRO,
  *Claimant,*
  and

1,679 FIREARMS; 87,983 ROUNDS OF
AMMUNITION; 3 AIRBURST
PROJECTILES; ASSORTED FUSES,
  *Defendants.*

No. 10-56808
D.C. No.
2:06-cv-05014-PJW
OPINION

Appeal from the United States District Court
for the Central District of California
Patrick J. Walsh, Magistrate Judge, Presiding

Argued and Submitted
February 17, 2012—Pasadena, California

Filed June 11, 2012

Before: Harry Pregerson, Michael Daly Hawkins, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

## COUNSEL

Steven R. Welk, United States Department of Justice, Office of the United States Attorney, Los Angeles, California, for the plaintiff-appellant/cross-appellee.

Lisa J. Jackson, Law Offices of Lisa J. Jackson, Pacific Palisades, California; Roger S. Hanson, Law Office of Roger S. Hanson, Santa Ana, California, for the claimant-appellee/cross-appellant.

## OPINION

BEA, Circuit Judge:

These cross-appeals arise from what we understand to be the largest civil *in rem* forfeiture proceeding against firearms unlawfully possessed by a convicted felon in American history. In dispute is a forfeiture order against hundreds of collectable guns valued at $2.55 million. After a bench trial, the district court ruled the entire collection forfeitable, but it later ordered that the government return 10% of the value of the collection, $255,000, to Claimant-Appellant Maria Ferro on the ground that a forfeiture so large violated the Eighth Amendment's prohibition on the imposition of an excessive fine. The government and the claimant both appealed. The government wants to pay back nothing. Maria Ferro wants the government to pay back much more.

This opinion addresses several issues. First, we hold that Maria Ferro is not entitled to the protections of the so-called "innocent owner" defense, and the district court was therefore correct to hold that the entire collection was subject to forfeiture. Second, we hold that, following a comprehensive revision to the forfeiture statutes in 2000, forfeitures of instrumentalities of crimes are subject to excessiveness analy-

sis under the Eighth Amendment's Excessive Fines Clause. Third, we hold that excessiveness review must consider the individualized culpability of the property's owner and, when analyzing the offending conduct, it must focus only on the conduct that actually gave rise to the forfeiture of the property at issue, not other criminal conduct by the same person. Because the district court erred on this third point, we remand for the district court to undertake once again the excessiveness inquiry.[1]

## I.

The facts of this case are unusual.

## A.

The sole valid claimant in this case, Maria Ferro, married Robert Ferro in 1979. In 1983, the Ferros moved to their current home at 2045 Tapia Way in Upland, California. After their marriage, Robert began to collect firearms, and Robert obtained federal firearms licenses to do so. All 1,679 firearms eventually seized in 2006 were obtained by Robert between 1983 and May 1992, while he was married to Maria Ferro and while the couple resided in California.[2]

In 1991, Robert was arrested by local police in California for possessing explosives. He was charged on November 16, 1991 with California state crimes that prohibit the possession of explosives and explosive ingredients. On May 1, 1992, before his state court trial, Robert conveyed in writing "all of

---

[1]In accompanying unpublished dispositions, we also address the constitutionality of the search that revealed the firearms, as well as a related appeal brought by Robert Ferro.

[2]Of the 1,679 firearms seized, some are contraband firearms, such as machine guns, hand grenades, and silencers, which are illegal for any private citizen to possess. *See infra* p. 6600. Maria has conceded the forfeitability of those contraband firearms, and they are not at issue on appeal. *Id.*

his property and possessions" to his wife Maria. The district court found this conveyance included the transfer of ownership of all of his firearms, and, in a separate filing, Robert himself expressly declared this to be true.

Robert was convicted of the crimes related to possession of explosives in that state court action and sentenced to two years in prison. Sometime in 1992, the Bureau of Alcohol, Tobacco, and Firearms (ATF) denied an application for renewal of Robert's firearms license which he had filed before his conviction. In a letter addressed to Robert, an ATF official explained that Robert "could continue his licensed operations under his now expired firearms licenses until 30 days after his conviction became final." The official explained in the letter that Robert's "conviction would be 'final' under the regulations when all appeals were exhausted." However, Robert Ferro lied to his wife by telling her that he legally could still possess firearms even after his conviction became final.

Robert's conviction became final in 1994. Robert then went to prison in June 1995 and was paroled in September 1996.

A decade later, in April, 2006, ATF agents searched the Ferros' home and initially seized over 700 firearms. ATF officials executed a second, more thorough search and found additional firearms as well as "87,983 rounds of ammunition, 35 machineguns, 130 silencers, three short-barreled rifles, three destructive devices, a live hand grenade, a military rocket launcher tube, five bullet-proof vests, grenade fuses, and grenade hulls." These additional firearms were hidden in the walls and floors of the Ferros' home. The ATF agents also discovered hidden rooms containing weapons, as well as an underground bunker that housed a shooting range.[3] Maria "did

---

[3]According to news reports, Robert Ferro is a former Army Special Forces Officer and Cuban exile who claims to be part of a "quasi-military group bent on overthrowing President Fidel Castro." http://

not know about the vast majority of the firearms hidden in her house; she did not know how many guns were in the house nor did she know where they were located." D. Ct. Findings of Fact and Concl. of Law at 4.

## B.

On August 10, 2006, the government, with all of the firearms in its custody, filed the complaint that initiated this civil in rem forfeiture action. The complaint was filed pursuant to 1) 18 U.S.C. § 924(d), which, as relevant here, subjects to forfeiture "[a]ny firearm or ammunition involved in or used in any knowing violation of," 18 U.S.C. § 922(g), the felon-in-possession statute; and 2) 26 U.S.C. § 5872, which subjects to forfeiture contraband items such as silencers, machine guns, and explosive materials. The first claim for relief in the complaint—which is the only claim still at issue, since Maria withdrew her claim on the property which consisted of "contraband firearms, ammunition, and various destructive devices," as opposed to the "collectable firearms"—alleged that all of the defendant items were subject to forfeiture because they were unlawfully possessed by a felon.

The firearms still in dispute make up a remarkable collection. At oral argument, the government said that when these proceedings conclude and the government has ownership of all the firearms, "a lot of these collectable firearms will be placed at the ATF museum, and will not be destroyed—not necessarily because of their value, but because of their rarity."[4]

---

havanajournal.com/politics/entry/cuban-exile-robert-ferro-arrested-on-weapons-possession-plot-to-kill-castro/. Robert contends that there were two distinct collections of firearms: "war weapons and machineguns," and his "wife's firearms collection." Robert says he told ATF agents that the weapons "were for a possible military operation [against Fidel Castro], but I believed that the mission had been aborted."

[4]Even if the fine is held to be excessive, the typical practice is to return the value of the fine in a monetary settlement. The guns themselves are unlikely ever to be returned to the Ferros.

Some of the firearms are gold-plated; others are early twentieth-century rarities; several are valued at $10,000 or more. Still, despite the fact that these weapons are a far cry from the inexpensive handguns used in most crimes, it is uncontested that all of the weapons meet the definition of "firearm" under 18 U.S.C. § 921(a)(3), wherein a "firearm" is defined as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."[5]

The forfeiture proceeding for the contested firearms is governed by 18 U.S.C. § 983, also known as the Civil Asset Forfeiture Reform Act, or CAFRA. Under CAFRA procedures, the government has the burden to show, by a preponderance of evidence, that the collectable firearms are subject to forfeiture. *Id.* at 983(c)(1). In district court, the government alleged that all of the defendant firearms were "involved in or used in any knowing violation of" 18 U.S.C. § 922(g), the felon-in-possession ban. Specifically, the government alleged that the firearms "were in the actual or constructive possession of a person, [Robert Ferro], who had been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1)." In turn, 18 U.S.C. § 922(g)(1) makes it unlawful for anyone "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" to "possess . . . any firearm or ammunition."

Maria Ferro raised the affirmative defense that the property is not forfeitable because she was an "innocent owner" and

---

[5]An "antique firearm" is defined as any firearm "manufactured in or before 1898," or a replica thereof. 18 U.S.C. § 921(a)(16). The oldest firearms in this collection appear to have been manufactured just after that cutoff.

"[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1). An innocent owner is an owner who "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(2)(A). To prevail on this defense, Maria had to prove by a preponderance of evidence that she was an innocent owner. *Id.* at § 983(d)(1).

The case proceeded to a two-day bench trial, with Maria Ferro as the sole claimant of the property. In a written order, the district court found that the firearms were subject to forfeiture because they had been in the possession of a convicted felon. The district court then rejected Maria's innocent owner defense to forfeiture. While the parties disputed whether Maria even qualified as an owner under the statute,[6] the district court assumed without deciding that Maria was an owner of the property under the statute but that she nonetheless was not "innocent." The district court found that Maria "kn[e]w of the conduct giving rise to the forfeiture" because she "knew that her husband had been convicted of a felony and sentenced to more than one year in jail and that he possessed these firearms after his conviction." D. Ct. Findings of Fact and Concl. of Law 8. For the district court, it was irrelevant whether Maria "underst[oo]d the significance of those facts [i.e., that Robert Ferro had been convicted of a felony and that he had possessed firearms] when applied to existing law." *Id.*

---

[6]For purposes of the innocent owner defense, the term "owner" is defined as anyone with a property interest in the disputed property but explicitly does not include "(i) a person with only a general unsecured interest in, or claim against, the property or estate of another; (ii) a bailee unless the bailor is identified and the bailee shows a colorable legitimate interest in the property seized; or (iii) a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983(d)(6)(B). The government contended that Maria was a mere "nominee."

The court accordingly ordered the firearms in the Ferro Collection forfeited.

Maria then moved to remit the forfeiture because it constituted an "excessive fine" under the Excessive Fines Clause of the Eighth Amendment. The district court granted her motion in part and, after finding that the forfeiture was "marginally disproportionate to the crimes," the court reduced the forfeiture by 10% of the $2.55 million value the court gave to the firearms at issue. D. Ct. Excessiveness Order 2. It ordered the government to "return to Claimant either $255,000 in firearms or to pay Claimant that amount in cash." *Id.* at 11.

As noted above, both sides appealed.

## II.

The district court's factual findings are reviewed for clear error. *United States v. Bajakajian*, 524 U.S. 321, 336 n.10 (1998). Its legal conclusions, including the determination whether a fine is unconstitutionally excessive, are reviewed de novo. *Id.*

## III.

This appeal presents three separate questions regarding the forfeiture. First, is Maria Ferro entitled to the innocent owner affirmative defense to forfeiture? Second, if she is not, is the property susceptible to an excessiveness analysis under the Eighth Amendment's Excessive Fines Clause? Third, if it is susceptible to excessiveness analysis, is the $2.55 million "fine" excessive? We address each in turn.[7] We begin with necessary background on how courts must analyze forfeitures

---

[7]It is uncontested in this appeal that Robert Ferro was in fact convicted of a prior felony, that he was in possession of the firearms even though Maria owned them, and that all of the guns still at issue count as "firearms" under 18 U.S.C. § 921(a)(3).

under the Eighth Amendment, and how the analysis changed in 2000 with the passage of a major reform statute called the Civil Asset Forfeiture Reform Act, or CAFRA. *See* Pub. L. 106-185, *relevant part codified at* 18 U.S.C. § 983.

## A. Background

**[1]** The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amd. VIII. For many years, the contours of the Excessive Fines Clause went unexplored by the Supreme Court. Until 1998, the Court had never applied the Clause to hold that a particular fine was excessive. *Bajakajian*, 524 U.S. at 327.

The Supreme Court's first case dealing with the potential application of the Excessive Fines Clause to civil *in rem* forfeitures was *Austin v. United States*, 509 U.S. 602 (1993). In *Austin*, the claimant was indicted in South Dakota for drug distribution, and the government initiated a civil *in rem* forfeiture proceeding against his mobile home and an automobile repair shop that he owned and that were allegedly connected to his drug trafficking offenses. *Id.* After canvassing the early history of both the Clause and of forfeiture proceedings, the Supreme Court held that the proper question was not "whether forfeiture under [the statute then at issue] is civil or criminal, but rather whether it is punishment." *Id.* at 610. The Court stated that a forfeiture may count as a "fine"—that is, a "payment to a sovereign as punishment for some offense," *Browning-Ferris Indus. v. Kelco Disposal*, 492 U.S. 257, 265 (1989)—even if the forfeiture was in part remedial. *Austin*, 509 U.S. at 621. Instead, if the forfeiture "cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, [it] is punishment." *Id.* (quoting *United States v. Halper*, 490 U.S. 435, 448 (1989)). The Court in *Austin* remanded for consideration of the question whether the forfeiture there was excessive and to let the lower courts consider in the first

instance "what factors should inform such a decision. . . ." *Id.* at 622-23.

Five years later, in *United States v. Bajakajian*, the Court held for the first time that a particular fine was excessive. 524 U.S. 321 (1998). In *Bajakajian*, the defendant was charged with failing to report that he was crossing the U.S. border with more than $10,000 in currency—in fact, Bajakajian was traveling to Cyprus with over $350,000 in currency. *Id.* at 324-25. Federal law provided that "any property . . . involved in such offense" was forfeitable in an *in personam* criminal proceeding. *Id.* The government attempted to confiscate all $357,154 in currency, but the Court held that such a fine was excessive under the Clause. *Id.* at 344.

The Court first looked to the history of forfeiture and noted that "traditional civil *in rem* forfeitures . . . were historically considered nonpunitive" and that such nonpunitive forfeitures "were considered to occupy a place outside the domain of the Excessive Fines Clause."[8] *Id.* at 330-31. But then, citing *Austin*, the Court noted that modern forfeiture laws were not generally aligned with this historical tradition, and could be "fines" for Eighth Amendment purposes. *Id.* Indeed, the Court cast substantial doubt on whether any strictly remedial forfeitures still existed, since "recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture." *Id.* at 331 n.6. Rather, the Court stated, it does not follow from historical practice that "all modern civil *in rem* forfeitures are nonpunitive and thus beyond the coverage of the Excessive Fines Clause . . . . [A] modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part. . . ." *Id.*

---

[8]We note that the *Bajakajian* Court's statements on this point appear to be in some conflict with the Court's earlier statement in *Austin* that "forfeiture generally and statutory *in rem* forfeiture in particular historically have been understood, at least in part, as punishment." *Austin*, 509 U.S. at 618. But perhaps the Court was referring to different time periods in each case.

The *Bajakajian* Court then considered and rejected the government's argument that the currency at issue was an "instrumentality" of the reporting offense and therefore could never be considered excessive. *Id.* at 333. The Court defined an "instrumentality" forfeiture as one involving "property that historically was subject to forfeiture because it was the actual means by which an offense was committed." *Id.* at 333 n.8. The Court then stated that "a forfeiture that reaches beyond this strict historical limitation [of forfeitability as an instrumentality] is *ipso facto* punitive and therefore subject to review under the Excessive Fines Clause." *Id.* Because the currency in *Bajakajian* was *not* an instrumentality of the offense—instead, the currency was "merely the subject of the crime of failure to report"—the Court ended its analysis of instrumentality forfeitures without stating explicitly whether they must be reviewed for excessiveness under the Clause. *Id.* at 334 n.9.

Soon after, the Ninth Circuit dealt with this possible "instrumentality exception" to Eighth Amendment analysis, in passing. *United States v. 3814 NW Thurman Street*, 164 F.3d 1191 (9th Cir. 1999). In *Thurman Street*, this court considered a civil *in rem* forfeiture of a $200,000 interest in the defendant real property. *Id.* at 1194. The property there was forfeitable because it constituted the "proceeds" of the claimant's alleged crime of lying on loan documents, which had provided the money needed to buy the realty; the lying was the crime which subjected the property to forfeiture. *Id.* at 1194-95. The *Thurman Street* court undertook an excessiveness analysis. *Id.* at 1197. Before doing so, it stated that "although this is an *in rem* proceeding, the proceeds here do not meet the 'instrumentality' test, which requires that the proceeds be 'the actual means by which an offense was committed.' " *Id.* (quoting *Bajakajian*, 524 U.S. at 334 n.8). The *Thurman Street* court did not state what the proper analysis would be if the forfeiture had met the instrumentality test.

The forfeiture landscape changed substantially in 2000 with the passage of CAFRA. *See* 18 U.S.C. § 983. Prior to 2000,

there were "scores of federal forfeiture statutes," which provided for the possible forfeiture, under disparate legal standards, of everything from "animals utilized in cock-fights and similar enterprises, to cigarettes seized from smugglers[,] to property obtained from violations of the Racketeer Influenced and Corrupt Organizations Act." H.R. Rep. 106-192 at 3 (internal citations omitted). Several other existing statutes allowed the government to use forfeiture as another "weapon in the war on drugs." *Id.*

**[2]** In passing CAFRA, Congress noted that the use of forfeiture by the federal government had skyrocketed in the 1980s and 1990s. The total value of forfeited assets was under $30 million in 1985, and eight years later, it was over $550 million. *Id.* at 4. Some members of Congress grew concerned about what the House Report on CAFRA called the "abuses" of civil forfeiture. *Id.* at 6. Under then-existing forfeiture statutes, the House Report stated categorically that "[c]ivil forfeiture is being used to punish a property owner for alleged criminal activity." *Id.* at 13.

As passed by the Congress and signed by the President in 2000, CAFRA worked a number of major changes to forfeiture law, two of which are particularly relevant here. First, it created a uniform innocent owner defense that applies to virtually all civil *in rem* forfeiture proceedings. *See* 18 U.S.C. § 983(d)(1). As previously explained, this provision renders offending property not forfeitable if the owner "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A). With this provision, Congress ensured that modern-day forfeiture differs from historical forfeiture, since the Supreme Court had earlier noted a "long and unbroken line of cases" which had previously held that, under certain historical forfeiture provisions, "an owner's interest in property may be forfeited by reason of the use to which the property is put even though

the owner did not know that it was to be put to such use." *Bennis v. Michigan*, 516 U.S. 442, 446 (1996). Under CAFRA, this type of forfeiture is no longer permitted.[9]

**[3]** Second, CAFRA itself incorporates guidelines to review a forfeiture for proportionality which largely track those stated by the Supreme Court in *Bajakajian*. CAFRA states that a claimant "may petition the court to determine whether the forfeiture was constitutionally excessive." 18 U.S.C. § 983(g)(1). When a claimant makes such a petition, a court should compare the forfeiture to the "gravity of the offense," and the claimant then has the burden of establishing the forfeiture is "grossly disproportional" to the offense. 18 U.S.C. § 983(g)(2)-(3). Then, if the court finds, by a preponderance of the evidence, that the forfeiture is "grossly disproportional to the offense," it must "reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment of the Constitution." *Id.* at 983(g)(3)-(4).

The effect of CAFRA on the Excessive Fines Clause analysis for a forfeiture of this type and magnitude is a novel question in this circuit.

## B.   The "innocent owner" defense

18 U.S.C. § 983(d)(1) provides that "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." Maria contends that she is an innocent owner and therefore that the property is entirely immune from civil forfeiture. The district court properly rejected this argument.

---

[9]The new, uniform innocent owner defense does have one important, narrow limitation. 18 U.S.C. § 983(d)(4) provides that "[n]otwithstanding any provision of this subsection, no person may assert an ownership interest under this subsection in contraband or other property that it is illegal to possess."

An innocent owner is an owner who "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A). Maria contends that she meets the requirements of the first prong, because "she did not know of the conduct giving rise to the forfeiture, that is—she did not know that her husband was prohibited by law from possessing firearms." Maria notes that the district court credited as true Maria's statement that she did not know Robert was legally prohibited from possessing any firearms following his California state conviction, and the government does not challenge this factual finding. Maria contends that since she did not know that her husband's possession of the firearms at issue was illegal, she is an innocent owner.

**[4]** Maria's argument elides the distinct concepts of knowledge of facts and knowledge of law. The innocent owner defense exempts from civil forfeiture any property owned by anyone who did not know of the conduct giving rise to the forfeiture. 18 U.S.C. § 983(2)(A). As the district court stated, Maria "knew that her husband had been convicted of a felony and sentenced to more than one year in jail and that he possessed these firearms after his conviction." That is all the conduct necessary to subject the firearms to forfeiture. It is well-established that "the felon in possession statute, § 922(g)(1), has no specific criminal intent element"—that is, "[c]ommission of the crime requires no 'act' other than knowing possession of a firearm by a convicted felon." *United States v. Beasley*, 346 F.3d 930, 934 (9th Cir. 2003).

**[5]** Further, while the legal significance of the district court's finding that Maria was ignorant of the applicability of the felon-in-possession law is unclear given the well-known legal precept that "[a]ll citizens are presumptively charged with knowledge of the law," *Atkins v. Parker*, 472 U.S. 115, 130 (1985), we need not explore that tension here. After all,

there is no dispute that Maria knew of the relevant *facts* that constituted Robert's commission of the crime of being a felon-in-possession. That is enough knowledge to make the innocent owner defense unavailable.

## C. *Whether these firearms are subject to excessiveness review*

**[6]** The government contends that the firearms here are categorically immune from excessiveness review as "instrumentalities" of the crime of being a felon-in-possession.[10] Before CAFRA in 2000, the government may have been correct in its contention that this category of forfeitures would be insulated from excessiveness review under the Constitution. But CAFRA changed the forfeiture landscape in 2000, and today we hold that forfeitable property is subject to review under the Excessive Fines Clause even if it can be considered an "instrumentality" of an offense. After CAFRA, we think it clear that all types of civil forfeitures—save perhaps forfeitures of contraband, such as unregistered hand grenades or illegal drugs—are subject to review for excessiveness.[11]

---

[10]Except where explicitly noted, our review in this and the following section is the same whether we consider the matter under the statute or the Excessive Fines Clause. The language used in the statute is virtually identical to that used by the Supreme Court in *Bajakajian*; CAFRA attempts to put the two inquiries on equal footing when it states that a court must "reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment of the Constitution." *Id.* at 983(g)(3)-(4).

[11]The government half-heartedly contends, in the alternative, that the guns here can be insulated from excessiveness review because they are "contraband." We easily reject this argument. As the district court properly stated, contraband is property that is "inherently illegal, the mere possession of which is a crime." D. Ct. Order on Remission of Forfeiture, at 3 (citing *von Hofe v. United States*, 492 F.3d 175, 184 (2d Cir. 2007)). None of the firearms still in dispute fall into that category: that is, if Robert Ferro were not a felon, he could have legally possessed them. The guns are therefore unlike "child pornography, counterfeit currency, and unregistered hand grenades" which are "objects, 'the possession of which, with-

In *Austin*, the Supreme Court stated that a sanction which "cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment" and is therefore subject to analysis under the Excessive Fines Clause. 509 U.S. at 621 (quoting *United States v. Halper*, 490 U.S. 435, 448 (1989)). In determining whether a fine is punitive, at least in part, the availability of an innocent owner defense is crucial. In *Austin*, the Court held the civil *in rem* forfeiture in that case was punitive since "[i]f forfeiture had been understood not to punish the owner, there would have been no reason to reserve the case of a truly innocent owner." 509 U.S. at 617.

**[7]** Under CAFRA, which governs this case, the innocent owner defense is now broadly available, except in the case of forfeiture of contraband. *See* 18 U.S.C. § 983(d). From this, we conclude that modern forfeiture statutes work "to punish the owner," at least in part, in all cases except for the forfeiture of contraband. Therefore, whatever the meaning of this court's prior reference to an "instrumentality test," whereby certain types of non-contraband forfeitures are insulated from excessiveness review, that language has been abrogated by CAFRA. *See Thurman Street*, 164 F.3d at 1197.

### D. The focus of the excessiveness inquiry

Although the district court properly subjected the fine here to excessiveness review, it misapplied the inquiry. Because the district court 1) focused solely on Robert Ferro's conduct and did not consider Maria's culpability, even though the punishment was actually levied on her, and 2) improperly consid-

---

out more, constitutes a crime.' " *von Hofe*, 492 F.3d at 184 (quoting *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699 (1965)); *see also United States v. 144,774 Pounds of Blue King Crab*, 410 F.3d 1131, 1132 (9th Cir. 2005) (holding that the illegally imported Blue King Crab was "property illegal to possess" under § 983(d)(4) because *no one* could lawfully possess it).

ered Robert Ferro's possession of contraband items for purposes of assessing the fine in this proceeding, we remand to the district court for a redetermination under the proper standard. We express no opinion as to the proper amount of forfeiture, since that is for the district court to determine in the first instance.

**[8]** As the Supreme Court has stated, and as CAFRA codifies by statute, "[a] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334; *see also* 18 U.S.C. 983(g). In assessing whether a fine is excessive, this court is "not required to consider any rigid set of factors." *United States v. $100,348 in Currency*, 354 F.3d 1110, 1121 (9th Cir. 2004) (internal quotation marks omitted). The district court, however, mechanistically applied four factors stated by this court in *$100,348 in Currency*: "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." D. Ct. Excessiveness Order at 7 (citing *$100,348 in Currency*, 354 F.3d at 1122). In applying these factors, it looked to whether the forfeiture "is grossly disproportional to the gravity of Robert Ferro's offenses." *Id.*

**[9]** It was error for the district court to focus solely on Robert Ferro's conduct and therefore fail to consider owner Maria Ferro's culpability, if any. Before *Bajakajian*, the caselaw in our circuit was clear that the excessiveness inquiry must focus, at least in part, on the "culpability of the owner." *See United States v. Real Property Located in El Dorado County at 6380 Little Canyon Road*, 59 F.3d 974, 982 (9th Cir. 1995). Although the actual two-pronged test for excessiveness followed by this court in *6380 Little Canyon Road* was abrogated in 1998 by *Bajakajian*'s "grossly disproportional" standard, nothing in *Bajakajian* directs a court to ignore the culpability of the owner and focus solely on whether the fine is excessive given the conduct that subjected

the property to forfeiture, i.e., Robert Ferro's possession of the collectable firearms. Indeed, *Bajakajian* was necessarily silent on that particular issue, since *Bajakajian* involved a criminal *in personam* forfeiture, which type of forfeiture "reaches only currency owned by someone *who himself commits* a reporting crime." *Bajakajian*, 524 U.S. at 328 n.3 (emphasis added). And the language of the Supreme Court's precise holding—that a court must examine whether a fine is "grossly disproportional to the gravity of *a defendant's* offense"—assumes a human defendant who is the actual person that committed the crime. *Id.* at 334 (emphasis added). Where, as here, the person who committed the sole crime charged which gave rise to forfeitability is not the property's owner, the culpability of the owner must be considered in the analysis. We must remember that Maria was *not* charged with any crime, much less a crime which in some way enabled or caused Robert's crime.

[10] The Eighth Amendment's Excessive Fines Clause requires the property owner's culpability to be considered. A "fine" as used in the Excessive Fines Clause refers to "a payment to a sovereign as punishment for some offense." *Browning-Ferris*, 492 U.S. at 265. As the property's owner, it is *Maria* who is forced to "pay the sovereign," and it is *Maria* who is being punished. Hence, the proportionality inquiry must center on Maria's culpability and the various factors mentioned in *$100,348 in Currency*, *supra* at 6612.

[11] The proper focus of the excessiveness inquiry is a novel issue for this circuit after *Bajakajian*. The Second Circuit, though, has explicitly considered this issue in a post-*Bajakajian* case, and it held that it is the individual culpability of a claimant—i.e., the person who is actually punished by the "fine"—which must be considered in the excessiveness analysis. In *von Hofe v. United States*, the government initiated a civil *in rem* forfeiture action against a home, worth approximately $248,000, owned jointly by claimants Harold and Kathleen von Hofe. 492 F.3d at 178-79. Upon a valid search,

the police had found 65 marijuana plants in the basement of the couple's home, and the property was subject to civil *in rem* forfeiture because the house had a "substantial connection" to the drug possession crime. *Id.* at 180-81. Harold and Kathleen von Hofe both filed as claimants for their respective shares of the property, and, on appeal from an order upholding the forfeiture of the entirety of both claimants' ownership interests, the Second Circuit analyzed whether the forfeiture was excessive with respect to each claimant. The district court found that Harold had been the one growing, using, and sharing the marijuana, and the Second Circuit affirmed that a forfeiture of Harold's $124,000 ownership interest was not excessive. *Id.* at 188.

**[12]** The court reached the contrary conclusion for Harold's wife Kathleen. *Id.* at 191. The court said that Kathleen's conduct could be "best described as turning a blind eye to her husband's marijuana cultivation in their basement." *Id.* Thus, although Kathleen "was not an innocent owner," she "b[ore] minimal blame for the criminal activity." *Id.* at 188-89. The Second Circuit found that the forfeiture of her entire $124,000 interest in the house was an excessive fine, but the Second Circuit remanded the case to the district court for further factual development without specifying the maximum constitutional fine. *Id.* at 191. We agree with the approach taken in *von Hofe*.

Of course, though *von Hofe* provides the correct approach, the outcome on these facts may be somewhat different. Especially from our vantage point as an appellate tribunal, Maria's culpability, if any, for enabling Robert's illegal possession of firearms is hard to assess. Maria knowingly allowed hundreds of collectable, and evidentially operational, firearms to be stored away in her house; they were there possessed by a felon. Moreover, even though she was the owner of hundreds of these firearms, the district court found that she "did not know about the vast majority of the firearms hidden in the house; she did not know how many guns were in the house

nor did she know where they were located." Some might think this careless because some of the firearms were operable. Others, more at home with the presence of firearms, would harbor no cause for alarm. Also, Maria seems to have been quite naive: she could also be characterized as a doting wife who failed to ask any hard questions of the husband she loved and trusted, and to whom she has been married for decades. Choosing among these or possibly other scenarios is something that must be done by the district court in the first instance, since that court is in a position to make credibility determinations and has doubtless become familiar with the principals over the course of this lengthy litigation.

**[13]** The government urges this court to focus only on Robert's conduct and contends that to allow Maria's culpability to be considered "suggests a profound misunderstanding of federal forfeiture law." The government then cites a *statutory* excessiveness inquiry which directs a district court to "compare the forfeiture to the gravity of the offense giving rise to the forfeiture."[12] 18 U.S.C. § 983(g)(3). But even if the government is correct that the *statutory* inquiry for excessiveness under § 983(g)(3) is limited to consideration of the conduct giving rise to the forfeiture, it is here where we must break from the terms of the statute and proceed directly to the Eighth Amendment analysis. While a statute can provide more protection for a defendant than the Constitution requires, it cannot provide less. Because we conclude that the *Constitution* requires consideration of the culpability of the property's owner, a district court must undertake that analysis, even if it is not required to do so under the statute.

---

[12]When considering the "gravity of the offense" of this unique felon-in-possession crime, the district court should also probably have considered the fact that many of the firearms here could not have reasonably been expected to have been used for criminal purposes because of their age and status as collectable firearms, but this contention is not pressed on appeal. Still, the district court is free to consider that fact as well when it undertakes its excessiveness inquiry anew.

**[14]** Second, the district court *improperly* focused on Robert Ferro's entire course of conduct rather than just the conduct that gave rise to the forfeiture of the collectable guns. For instance, the district court, in discussing what "other penalties [were] authorized for these violations," included Robert's possession of a "military rocket-launcher tube," "guns with obliterated serial numbers," a "hand grenade," and other contraband weapons such as a "sawed-off shotgun." D. Ct. Forfeiture Order 8-9. As Maria points out, the inclusion of the contraband weapons in the analysis is unfair double-counting because those contraband firearms were already forfeited without challenge from Maria. Because the collectable firearms are the only property remaining in this proceeding, their unlawful possession should be the sole focus of the excessiveness inquiry.

\* \* \*

**[15]** Today, we answer three questions in federal forfeiture law: (1) whether the innocent owner defense is available to those who know of all of the relevant facts giving rise to the property's forfeitability; (2) whether a civil forfeiture of the "instrumentalities" of a crime can be reviewed for excessiveness; and (3) whether excessiveness review must focus on the individualized culpability of the property's owner. As the answers to those questions apply to this case, we AFFIRM the district court's order that the property here is forfeitable, and we VACATE the determination of excessiveness and REMAND for reconsideration of the excessiveness inquiry according to the principles discussed in this opinion. We express no view as to what the proper amount of reduction will be under a corrected excessiveness analysis.[13]

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

[13]Each party shall bear its own costs for these cross-appeals.