**UNITED STATES of America, Plaintiff,**

v.

**ONE PARCEL OF PROPERTY LOCATED AT 5 REYNOLDS LANE, WATERFORD, CONNECTICUT, With All Appurtenances and Improvements Thereon, Defendant.**

**[Claimants Seth Marder and Beth Marder].**

**No. 3:09–cv–543 (CSH).**

United States District Court, D. Connecticut.

July 25, 2013.

David X. Sullivan, Ndidi N. Moses, U.S. Attorney's Office, New Haven, CT, for Plaintiff.

William T. Koch, Jr., Lyme, CT, for Defendant.

### *FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION*

HAIGHT, Senior District Judge:

This is an *in rem* civil action wherein Plaintiff United States of America ("the Government") seeks forfeiture of 5 Reynolds Lane, Waterford, Connecticut ("the Property") pursuant to 21 U.S.C. § 881(a)(7) because the Property was used to commit, or facilitate the commission of, a violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* ("CSA").

The Property is a private residence jointly owned and occupied by its Claimants, Seth Marder and Beth Marder.

The Government's theory of the case is that it is entitled by the statutory scheme to forfeiture of the Property. The Claimants' theory of the case is that forfeiture of their home would violate the Constitution's prohibition of excessive fines.

## I.  INTRODUCTION

In a Ruling reported at 895 F.Supp.2d 305 (D.Conn.2012) (*"Marder I "*), familiarity with which is assumed, the Court granted partial summary judgment to the Government, and held the Property is subject to forfeiture because it was in fact used to facilitate a violation of § 841(a) of the CSA, specifically, the manufacture of marijuana. In a subsequent Ruling reported at 909 F.Supp.2d 131 (D.Conn.2012) (*"Marder II "*), familiarity with which is also assumed, the Court set the case down for a bench trial on the issue of "whether a forfeiture of the Claimants' interests in the Defendant Property passes muster under the Excessive Fines Clause" of the Eighth Amendment to the United States Constitution. 909 F.Supp.2d at 136.

That bench trial was held on April 9, 2013. Counsel for the Government and the Claimants summed up after closing of the proof. The Court now enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## II.  FINDINGS OF FACT

1.  The Property is a single-family residential building with a detached garage, located at 5 Reynolds Lane in the Town of Waterford, Connecticut. The parties stipulated at trial that "the current fair market value of the 5 Reynolds Lane, Waterford, Connecticut property is $200,000." Tr. 11–12.[1] The Court accepts that stipulation and finds that the current market value of the Property is established thereby, in the amount of $200,000.

2.  The Claimants do not dispute that, as the Government alleges, during the relevant times Claimants used the Property to cultivate marijuana plants and manufacture the consumable marijuana that the plants, in the natural order of things, produced. In consequence, these Findings set forth those underlying facts in somewhat abbreviated form, but in sufficient detail to furnish the background for Claimants' contention that forfeiture of their home by the Government violates the Excessive Fines Clause of the Eighth Amendment.[2]

3.  Claimant Seth Marder (sometimes hereinafter "Seth") was born in Kansas City, Missouri on September 28, 1961, and

---

1.  "Tr." references are to pages in the trial transcript [Doc. 66].

2.  The bench trial, which was organized and conducted with admirable professional skill by counsel for all parties, consumed only one trial day. Claimants, who have the burden of proof on the asserted excessiveness of the fine represented by forfeiture of their home, called Beth Marder as a witness and then rested. Seth Marder was said by Claimants' counsel to be unavailable. The Government, desiring Seth Marder's testimony as part of the trial record, offered the transcript of Seth Marder's pre-trial deposition as part of the Government's case, which the Court received into evidence without objection. Tr. 155–156. The Government also called Special Agent Jon Rubinstein, of the United States Drug Enforcement Administration ("DEA"), as a witness at trial, and rested. Beth Marder was called briefly as a rebuttal witness for Claimants. Both sides then rested, Tr. 219, and counsel summed up the same day. The Court bases the Findings of Fact in text upon the testimony of these three witnesses, and upon the exhibits received into evidence during the trial.

was 49 years old when the Government deposed him in this action on April 6, 2011. On that date, Seth was suffering from chronic depression and bipolar disorder, had been so afflicted for a number of prior years, and has these conditions today. When in his twenties, Seth was living in California, and at the suggestion of a friend began seeing a psychiatrist on a regular basis.

4. Seth had smoked marijuana when in high school, quit for ten years, and started again at about age 28, at which time, he testified at his deposition, "I knew that it helped my symptoms but I would say it was recreational because there were no laws on the books in California that said it was—you could have medical marijuana." Dep. Tr. 17. That changed in 1996, when California passed a statute legalizing the use of marijuana for medical reasons, on a physician's written approval. Seth began his legalized medical use of marijuana in 1996 and continued that use thereafter; Exhibit 1 to his deposition is a Physician's Statement dated May 25, 2004, signed by Robert E. Sullivan, M.D., which states, *inter alia*, that Seth Marder, a resident of Yreka, California, "has a serious medical condition which, in my professional opinion, may benefit from the use of medical cannabis." Seth signed a Patient's Declaration at the bottom of the document which acknowledges his understanding that "cannabis remains illegal under federal law."

5. Seth Marder married Beth Marder (*nee* Beth Greenhalgh, sometimes hereinafter "Beth") in California in June 2003. Prior to and after their marriage, the Marders lived together in a house in Yreka that was in Seth's name only. Seth had no regular employment. Beth was working part time on the faculty of the Laurel Springs School, a private school in southern California, and part time for the Cali-

fornia Department of Fish and Game. She still teaches at Laurel Springs, by means of online technology.

6. For as long as Beth knew Seth, Seth was growing and using marijuana for medicinal reasons, specifically, to control the mental disabilities attendant upon his underlying conditions. Seth cultivated marijuana plants at the home the Marders occupied in Yreka. Beth assisted him in that cultivation. Seth sold quantities of marijuana that exceeded his personal requirements to "marijuana clubs" in the Bay Area of California, which came into wider availability when California passed its 1996 law legalizing the use of marijuana for medical reasons. Seth Marder estimated at his deposition that from about the year 2000 until the Marders moved from California to Connecticut, he made approximately $100,000 by selling marijuana to marijuana clubs.

7. In July of 2005, the Marders sold the Yreka, California house and moved to the Property at 5 Reynolds Lane, Waterford, Connecticut, which they purchased jointly. Waterford had the advantage of being centrally located between the Cape Cod, Massachusetts home of Beth's mother (who was terminally ill) and the home of Seth's mother in Greenwich, Connecticut. The Property is accurately described in *Marder I* as "a single family two story wood and cement building with a detached barn-style garage." 895 F.Supp.2d at 307.

8. Before departing for Connecticut, the Marders sold the Yreka, California house and held a yard sale for some of its contents. But the equipment used to grow and cultivate marijuana was not sold. The Marders kept that equipment and transported it to Connecticut, intending to grow and cultivate marijuana in their new home: an intention they promptly acted upon. Beth Marder testified that the Marders started growing marijuana at the Property

"around the end of 2005, beginning of 2006" and continued to do so "until the [search] warrant was executed on March 18, 2009." Tr. 67.

9. The Marders used a considerable amount of marijuana-growing equipment. The equipment included, for instance, 16 large devices referred to in the evidence as "white hooded lamps" or "grow lights." These lamps were placed in the Property's garage. They cast a strong light upon marijuana plants and seedlings positioned beneath them, and assisted their growth. Moreover, each lamp was accompanied by a device called a "ballast," whose necessity for the operation was explained by Beth Marder on cross-examination by counsel for the Government:

Q. Now, for every light that you had to grow marijuana, there was also a ballast; is that correct?

A. That's correct.

Q. And could you explain to the Court what a ballast is?

A. Yes. It's used to, almost like a battery, to power the lights themselves.

Q. And if you know, Mrs. Marder, why do you need a ballast to assist in, you know, operating these lights?

A. Well, as I stated, they're—that's, you can't just plug a light into a socket. It has to go through a, it's almost like a power generator.

Tr. 94. As this case exemplifies, the unusually high electrical consumption triggered by such operations can strengthen the suspicion of surveilling law enforcement officers that marijuana cultivation may be going on at a particular house.

10. Jon Rubinstein, an experienced DEA agent who participated in the search of the Property on March 18, 2009 under the circumstances related *infra*, surveyed the garage with its ranks of grow lights and ballasts, together with the other para-

phernalia of marijuana cultivation (boxes, plants, seedlings, cut leaves, hoses, packaging, etc.), and praised the Marders' achievement at trial, with words they probably heard with mixed emotions:

Q. [by Government counsel] Now, based upon your training and experience, what was the size of this marijuana grow based upon those in which you've investigated in your past 23–year career?

A. [after objection, which was overruled] This was an operational grow that was, I've seen bigger, I've seen smaller. But this was a functioning, clean, well-thought out, well-concealed producing grow.

Q. And when you say "well-concealed," what do you mean by that?

A. They took some steps to hide their operation. The windows were blackened out, covered with plastic in the grow garage.

Tr. 179–180.

11. The death knell for the Marders' "operational grow" was struck when during the week of March 9, 2009, an acquaintance visited the Property, observed the cultivation, consumption and sharing of marijuana, and passed that information on to DEA agents assigned to the agency's New Haven office. The agents designated their informant as "CC" for "concerned citizen"; the Marders would undoubtedly employ a different phrasing. This tip touched off a joint investigation conducted by DEA agents and Waterford Police Department officers which resulted in a State court judge's issuance of a search warrant for the Property on March 18, 2009. The full particulars of this investigation and warrant issuance are set forth in *Marder I*, 895 F.Supp.2d at 307–308, and are incorporated by reference in these Findings of Fact.

12. Law enforcement officers executed the warrant by searching the house at 5 Reynolds Lane and its detached garage. The officers found and seized considerable amounts of marijuana in various stages of cultivation (seedlings, plants, harvested leaves). They also seized the paraphernalia described in ¶¶ 9 and 10 of these Findings. Seth Marder and Beth Marder were both at the Property when the search party arrived. In agent Rubinstein's parlance they were "secured," which, one supposes, means they were arrested.

13. There was a considerable body of evidence elicited at trial about the amount of marijuana discovered and seized at the Property during the search on March 18, 2009. I need not make detailed Findings of Fact on this subject because the presence of the relevant amount for CSA purposes is undisputed. Specifically, the Government sought and obtained summary judgment holding the Property subject to forfeiture on the basis of the Marders' possessing and cultivating "100 or more marijuana plants regardless of weight," one of the several specifications of a CSA violation. 21 U.S.C. § 841(b)(1)(B)(vii). During the proceedings culminating in the Court's ruling in *Marder I,* the Government asserted and the Claimants admitted that "approximately 100 marijuana seedling plants were discovered by law enforcement officers in the laundry room of the Defendant property," and "approximately 100 marijuana plants in various stages of growth" were discovered "[i]n the barn-style garage on the Defendant Property." 895 F.Supp.2d at 308. I accept those undisputed numbers of plants, totaling about 200, for the purpose of these Findings.

14. Seth Marder testified at his deposition that he never sold marijuana from the Property to anyone, and marijuana was never shipped from the Property to any other individual. Dep. Tr. 33–34. On that point, this exchange occurred during the deposition:

Q. [by Government counsel]: Is it your testimony today that all of the marijuana that was found at your residence on March 18, 2009 was solely for your personal use and the personal use of your wife, Beth Marder?

A. Yes, I do.

Dep. Tr. 34–35. Seth's response as transcribed is grammatically odd, but its clear import is: "Yes, that is my testimony, and those are the facts." Beth Marder testified at trial that neither Seth nor she ever sold to others any of the marijuana they grew at the Property, and they never profited financially from any marijuana they grew there. Tr. 38–39. I accept the Marders' testimony on this aspect of the case. The Government appears to view these disclaimers skeptically, its doubts arising from the amount of marijuana discovered at the Property (house and garage), and packaging material which, to agent Rubinstein's trained eye, looked like the kind that might be used to ship marijuana from one place to another. However, neither the federal DEA nor the local Waterford police took any follow-up investigatory steps to determine if the Marders were selling or distributing marijuana to others, and there is no evidence in the record in direct contradiction of the Marders' testimony. The Government may harbor suspicion, but suspicion is not proof.

15. The case for the Marders is that both smoked marijuana for medical reasons. Seth Marder's deposition testimony with respect to his own medical needs was noted in ¶ 4, *supra.* Over Government objection, Beth Marder testified on direct examination at trial:

Q. Based on your testimony, you smoke marijuana?

A. Yes, I did.

Q. Smoked. And why did you smoke it?

A. I smoked it for medicinal reasons, due to my chronic neurological Lyme disease diagnosed in December of 2005.

\* \* \*

Q. To your knowledge, did Seth Marder smoke marijuana?

A. Yes, he did.

Q. And to your knowledge, why did he smoke marijuana?

A. He smoked marijuana to alleviate his symptoms of depression and bipolar disorder as diagnosed by a psychiatrist.

Q. And did he smoke marijuana before you moved to Connecticut?

A. Yes, he did.

Q. And for the same reasons, to your knowledge?

A. Yes, he had a psychiatrist prescribe medical marijuana for his use.

Tr. 38, 40–41.[3]

16. Two observations may be made about the testimony quoted in ¶ 15. The psychiatrist prescribing marijuana for Seth Marder practiced in California, where the Marders lived at the time. The use of marijuana for medical reasons was legal in California, but it is illegal in Connecticut, and no Connecticut physician could have prescribed use of the substance. And the careful reader will have noticed that Beth Marder, correcting her trial counsel, described her smoking marijuana in the past tense. The Marders assert that they stopped growing and smoking marijuana at the Property after the search and seizure. At the beginning of his deposition Seth Marder, responding to routine questions about his current health, testified that he was under the influence of prescribed medications; this exchange then occurred:

Q. What have you taken today, sir?

A. I take Klonopin, Allopurinol, Safras, Prozac. And that is what I take.

Q. All right. Those medications that you just mentioned, were you taking those medications before your arrest on March 18th of 2009?

A. I was taking a different regimen.

Q. Okay.

A. They have switched the pills. Since I got rid of the marijuana, it's made things more difficult and they have put different pills in place of others.

Q. Okay. So, since your arrest on March 18th of 2009 have you smoked any marijuana?

A. No, I haven't.

Q. Okay. Since March 18th of 2009 have you grown any marijuana?

A. No, I haven't.

Dep. Tr. 8–9. I accept the Marders' testimony on this point, and find on this record that since the search and seizure on March 18, 2009, the Marders have neither grown nor smoked marijuana at the Property. That testimony is credible, uncontradicted by any other evidence in the record, and inherently plausible. The Marders are intelligent people. They would not be inclined to resume their marijuana-eased lifestyle after coming to such prominent attention in the minds and eyes of federal and local law enforcement agencies.

---

**3.** In objecting to this medical-use testimony, the Government correctly contended that medical use by individuals is irrelevant to the question of whether a specific property is subject to forfeiture under the federal Controlled Substances Act. The Court received the evidence in order to make a full record on the related but separate question of whether forfeiture of the property would, in the particular circumstances of the case, violate the Excessive Fines Clause.

17. When the Marders moved to Waterford, Connecticut in 2005, and at all pertinent times thereafter, Seth Marder and Beth Marder each knew that their conduct in growing marijuana at the Property was illegal, under the laws of both the United States and the State of Connecticut.

## III. CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to the Controlled Substances Act, 21 U.S.C. § 881(a)(7), *in rem* jurisdiction over the Defendant Property, and personal jurisdiction over Plaintiff United States and the Claimants of the Property.

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. While Cruel and Unusual Punishment cases are legion, for many years the Supreme Court did not concern itself with the Excessive Fines Clause. Until 1998, the Court had never applied the Clause to hold that a particular fine was excessive. It did so in *United States v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), which held for the first time that a fine was constitutionally excessive.

Bajakajian was charged with failing to report that he was crossing the U.S. border with more than $10,000 in currency— in fact, he was traveling to Cyprus with $357,154 in currency. Federal law provided that "any property ... involved in such offense" was forfeitable in an *in personam* criminal proceeding." The government attempted to confiscate all $357,154, but the Court held that such a fine was excessive under the Clause. The Court paved the way for *Bajakajian* in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), which held that the applicability of the Excess Fines Clause to a particular forfeiture depended upon whether the forfeiture was punitive and consequently considered a fine for purposes of the Clause, or remedial and falling outside the Clause. Significantly for the case at bar, *Austin* held that forfeitures of real property pursuant to 21 U.S.C. § 881(a)(7) are punitive in nature and therefore fall within the scope of the Excessive Fines Clause. Having decided that in principle, the Court in *Austin* remanded the case to the district court to consider whether the forfeiture there was excessive and to let the lower courts decide in the first instance "what factors should inform such a decision ..." *Id.* at 622–23, 113 S.Ct. 2801. The Supreme Court articulated some factors of its own when five years later it came to decide *Bajakajian.*

In the year 2000, Congress looked about and discovered that there were "scores of federal forfeiture statutes," which provided for the possible forfeiture, under disparate legal standards, of everything from "animals utilized in cock-fights and similar enterprises, to cigarettes seized from smugglers[,] to property obtained from violations of the Racketeer Influenced and Corrupt Organizations Act." H.R. Rep. 106–192 at 3 (internal citations omitted). Several other existing statutes allowed the government to use forfeiture as another "weapon in the war on drugs." *Id.* (cited and quoted in *United States v. Ferro,* 681 F.3d 1105, 1112 (9th Cir.2012)). Congress reacted to this cluttered array by passing, and the President signed, the Civil Asset Forfeiture Reform Act, 18 U.S.C. §§ 983 *et seq.* ("CAFRA"), as a result of which "the forfeiture landscape changed substantially." *Ferro,* 681 F.3d at 1112.

CAFRA now requires the government to prove to a jury "that there was a substantial connection between the property and

the offense." 18 U.S.C. § 983(c)(3). Any person "claiming an interest in the seized property may file a claim" asserting such interest, § 983(a)(4)(A), as the Marders have done; hence their designation as "Claimants." § 983(g) provides in full:

(1) The claimant under subsection (a)(4) may petition the court to determine whether the forfeiture was constitutionally excessive.

(2) In making the determination, the court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture.

(3) The claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence at a hearing conducted by the court without a jury.

(4) If the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment to the Constitution.

In the case at bar, the Court granted summary judgment for the Government on the first prong of the inquiry, that there was a substantial (and obvious) connection between the property and the offense. The bench trial that followed was conducted pursuant to the provisions of § 983(g) of CAFRA.

This analysis brings us to the Second Circuit's relatively recent decision, squarely applicable to the case at bar: *von Hofe v. United States*, 492 F.3d 175 (2007). In *Marder I* and *Marder II*, I discussed *von Hofe* at some length. For present purposes, it is sufficient to say that the facts in *von Hofe* resemble those in this case in striking ways. Harold and Kathleen von Hofe, a married couple, jointly owned and lived in a residential building "with an undisputed value of $248,000," which the Second Circuit described as "a ranch house located on a small wooded lot in Branford, Connecticut," with the street address of 32 Medley Lane. 492 F.3d at 179. Acting on a tip from a confidential informant, the Branford Police Department began investigating possible cultivation of marijuana at 32 Medley Lane, obtained a search warrant on the strength of subpoenaed electrical records showing abnormal consumption, and conducted a search of the house together with DEA agents, with these results:

Sixty-five marijuana plants, a small postage scale with marijuana residue on its pan, a jar partially filled with marijuana buds, several glass marijuana pipes, and other items commonly associated with the indoor cultivation of marijuana were discovered in the basement of the house. Neither large amounts of cash, glassine bags, nor firearms—indicia of the drug trade—were found.

*Id.*

The State of Connecticut filed criminal charges against both von Hofes. As in the case at bar, the federal government chose not to prosecute the von Hofes personally, but instead instituted a civil *in rem* forfeiture action against 32 Medley Lane, which was assigned to District Judge Mark Kravitz. Judge Kravitz conducted a jury trial. The jury concluded that the von Hofes' house was subject to forfeiture under the CSA. Judge Kravitz discharged the jury, and then "conducted an evidentiary hearing to determine whether forfeiture of 32 Medley Lane would violate the Excessive Fines Clause of the Eighth Amendment." 492 F.3d at 181.

Judge Kravitz held that the interests of both von Hofes were forfeit to the government. That was the functional equivalent of a $124,000 fine levied against each of the von Hofes, given their undivided one-half interest in the undisputed property value

of $248,000. That holding conferred upon the government the right to evict the von Hofes from their home. On appeal, the Second Circuit affirmed as to Harold von Hofe but reversed as to Kathleen von Hofe. The court of appeals regarded the forfeiture of Harold's interest in .32 Medley Lane as permissible, but a $124,000 fine against Kathleen as constitutionally excessive, when taking the form of a forfeiture: "Not only would forfeiture extinguish her substantial equity, it would amount to an eviction," 492 F.3d at 188. In its holdings, the Court gave separate consideration to the personal factors affecting each of the von Hofes, husband and wife.

Judge Wesley began his analysis for the court of appeals in *von Hofe* with references to the Supreme Court's decisions in *Austin* and *Bajakajian,* and the subsequently enacted CAFRA statute. He acknowledged, perhaps somewhat ruefully, that: "The confluence of *Bajakajian* and CAFRA and the dearth of relevant case law from our court vexed the district court." 492 F.3d at 183. To prevent or reduce any future vexation of district judges, the Second Circuit in *von Hofe* concluded an exhaustive examination of prior authorities, including some of its own earlier decisions, with this definitive statement of the law in cases such as the one at bar:

> We thus frame our excessiveness inquiry in terms of the following considerations: (1) the harshness, or gross disproportionality, of the forfeiture in comparison to the gravity of the offense, giving due regard to (a) the offense committed and its relation to other criminal activity, (b) whether the claimant falls within the class of persons for whom the statute was designed, (c) the punishments available, and (d) the harm caused by the claimant's conduct; (2) the nexus between the property and the criminal offenses,

including the deliberate nature of the use and the temporal and spatial extent of the use; and (3) the culpability of each claimant.

*Id.* at 186. Those considerations are binding upon this Court in this case.

Obedient to its own holding that "the culpability of each claimant" is a pertinent consideration in forfeiture cases, the Second Circuit in *von Hofe* examined in detail the individual conduct of both Harold and Kathleen. I need not recount all the court's detailed findings; their tenor and substance are adequately disclosed by this concluding paragraph:

> On balance, forfeiture of Kathleen von Hofe's interest in 32 Medley Lane is an excessive fine. We do not dispute Congress's judgment regarding the pernicious effects caused by illicit drugs, either through health problems, lost productivity, or their connection to other illegal activity. Nor do we doubt that forfeiture of real property creates an incentive for property owners to abate any criminal activity occurring on their property. But the severity of the problem cannot excuse the need for scrupulous adherence to our constitutional principles. Mrs. von Hofe's offensive conduct boils down to her joint ownership of 32 Medley Lane and silence in the face of her husband's decision to grow marijuana in their basement almost thirty years into their marriage. And yet she is being punished as if she were distributing drugs, when the district court concluded as a matter of fact that she had no knowledge of any distribution or remuneration. The government cannot justify forfeiture of Mrs. Von Hofe's interest in 32 Medley Lane for the punishment bears no reasonable correlation either to her minimal culpability or any harm she caused.

492 F.3d at 191 (citations and internal quotation marks omitted).[4]

I need not pursue the relative conduct of the von Hofes further because the conduct of the Marders is entirely different. If the reader will excuse the expression, the Marders' cultivation of marijuana at 5 Reynolds Lane was in every sense a joint operation. When they were married and still living in California, Beth Marder was fully aware of, and assisted Seth Marder in, the cultivation of marijuana at their home. She shared in the transportation of elaborate marijuana-growing equipment from California to Connecticut, driving one of the two U–Haul trucks necessary for the family move. Once at 5 Reynolds Lane, Beth Marder participated fully in the considerable efforts necessary to plant, tend and cultivate several hundred marijuana plants in the detached garage and the laundry room of the house. Beth does not contend otherwise. And Beth Marder became, together with her husband, a consumer of home-grown marijuana for medical reasons: in a perverse welcome to Connecticut, after the move from California she was diagnosed with chronic Lyme disease. In consequence, there is no basis for this Court to distinguish between the Marders in respect of their vulnerability to forfeiture, as there was for the Second Circuit when considering the von Hofes.

When one applies the Second Circuit's considerations declared in *von Hofe* to the Property in this case and the Claimants' interests in that Property, it is readily apparent that the Property must be forfeited by the Marders to the Government.

The Property is subject to forfeiture because the Government proved on its motion for partial summary judgment that, as § 983(c)(3) of CAFRA required, "there was a substantial connection between the property and the offense": a self-evident proposition when the illegal marijuana plants are tended and cultivated in buildings on the property. That is why the Government obtained summary judgment on that issue.

The burden then falls upon the Marders under § 983(g) of CAFRA to prove by a preponderance of the evidence that the forfeiture is "constitutionally excessive" because it is "grossly disproportional" to the offense. In *von Hofe* the Second Circuit distilled those statutory provisions into its first consideration: a claimant must prove a forfeiture is unconstitutional because of its "harshness, or gross disproportionality, of the forfeiture in comparison to the gravity of the offense." The Marders cannot sustain that burden in the face of the Second Circuit's reasoning in declaring Harold von Hofe's interest in 32 Medley Lane forfeit to the Government:

> Although forfeiture will extinguish Harold von Hofe's equity in 32 Medley Lane, the temporal and spatial extent of his criminal activity make clear that his own actions eviscerated any sanctity he might claim in his home. He made the conscious and deliberate decision to grow marijuana in his basement for ap-

---

4. Earlier in its opinion, and on this subject, the Second Circuit said: "The record is devoid of any evidence indicating [Kathleen's] use of drugs or her involvement in any criminal activity. We also have no evidence to suggest Mrs. von Hofe encouraged or promoted the offensive conduct occurring at 32 Medley Lane.... It was thus Harold von Hofe's decision, almost thirty years into his marriage and as joint owner of 32 Medley Lane, to cultivate marijuana that put his wife in the present position. Mrs. Von Hofe's culpability, falling at the low end of the scale, is best described as turning a blind eye to her husband's marijuana cultivation in their basement." 492 F.3d at 188–189. Beth Marder's situation is entirely different. She participated fully in the conjugal cultivation of marijuana at the Property.

proximately one year, an operation cut short only because the Branford Police and the DEA intervened. This was neither a spur of the moment decision nor a momentary lapse of judgment. Mr. Von Hofe instead expended considerable time and resources obtaining the marijuana seeds from Holland, procuring the necessary equipment, and cultivating and cloning marijuana. If two cocaine sales in the amount of $250 warrants forfeiture of one's residence, *see [United States v.] 38 Whalers Cove*, 954 F.2d [29] at 32 [ (2d Cir.1992) ], so too must the year-long cultivation of sixty-five marijuana plants in the basement of a home.

492 F.3d at 188. These circumstances, the Second Circuit held, "allow us easily to conclude that forfeiture of his one-half interest in 32 Medley Lane is not an excessive fine." *Id.* The Marders cultivated more marijuana plants at 5 Reynolds Lane for a longer period of time, an operation cut short only because the Waterford Police and the DEA intervened. The forfeiture of their individual interests in the Property cannot be regarded as excessive fines.[5]

The second and third considerations articulated by the Second Circuit in *von Hofe* raise no issues in the case at bar. The nexus between the property and the criminal offense is obvious; and the culpability

of each of the two Claimants is identical to that of the other.

In his summation Mr. Koch, counsel for the Claimants, did not concede these several points, but the main thrust of his argument was that this Court should disregard, or perhaps more precisely look beyond, the Second Circuit's opinion in *von Hofe* and the statutory scheme which informed that decision.

Having pointed out that Judge Kravitz's decision to forfeit the von Hofes' interests in their home is dated 2005, Mr. Koch went on to say: "We're now in 2013. A lot has changed in terms of evolving standards with respect to marijuana from 2005 to 2013." Tr. 248. That preliminary contention is blunted somewhat by the date of the Second Circuit's opinion in *von Hofe*, which is 2007, but that does not preclude counsel's principal theme: Mr. Koch remains at liberty to contend, and he does contend, that "a lot has changed in terms of evolving standards with respect to marijuana from *2007* to 2013." He urged both propositions upon the Court: "[S]even years after Judge Kravitz's decision, marijuana is legal in Colorado and Washington. That's where we're headed." Tr. 254; and: "[T]hings have changed since the Court of Appeals' decision [in *von Hofe*]. Marijuana is not even illicit in some states in the United States. And it's not illicit in

---

**5.** During the Second Circuit's discussion of Harold von Hofe quoted in text, the court also referred to "Mr. Von Hofe's lengthy and extensive involvement in the manufacture and distribution of marijuana from his basement," 492 F.3d at 188. In point of fact, Harold von Hofe's "distribution" of marijuana to others than family members, described at 492 F.3d at 186, was minimal, and "the government chose not to introduce evidence that indicates either the value of the marijuana obtained at 32 Medley Lane or the profit inuring to Mr. Von Hofe from his marijuana grow," *Id.* at 187. The most that could be said by the court of appeals about Harold's "distribution" was

that "he manufactured an illicit substance, which he contributed to the local market, thereby perpetuating the product's availability *for himself, his neighbors and his son." Id.* at 186 (emphasis added). This sort of conduct is akin to the Marders' making their marijuana available to acquaintances who dropped by 5 Reynolds Lane: one of whom turned out to be an informer. For the reasons stated in text, Seth Marder and Beth Marder find themselves in the same position as Harold von Hofe when it comes to deciding whether forfeiture of their Property interests constitute excessive fines. They do not.

a lot of the states for medical use." Tr. 259. Adopting the role of a prophet and peering into the future, Mr. Koch said:

So, we're taking about trends. I'm asking your Honor to as President Obama and sometimes Mrs. Clinton says, "Be on the right side of history," because if you look at the trends, and you look at federal legislation that's recently been imposed, history is going to show that at some point in time, you're going to be doing legally exactly what the Marders did in this case.... The future, if you want to be on the side of history, is when marijuana is going to become legal and the Government will make 10 times as much money taxing it. That's where we're going to go.

Tr. 254–255. In these circumstances, present and foretold, Mr. Koch concluded that "it's going to be a travesty at this point in time for you to take the whole house, for you to take their whole house," Tr. 255, because "[b]ased on the trend, your Honor, and facts of this case, the Government trying to take someone's house I think is excessive." Tr. 260.

Counsel makes this argument forcefully and with skill; the genuineness and depth of his convictions are manifest. Mr. Koch drew from history examples of other "evolving standards." It was once legal, counsel reminded us, to own slaves; deny women the vote; forcefully sterilize the mentally retarded; forbid inter-racial marriage; forbid acts of sodomy between consenting adults; and execute the mentally retarded for committing a felony. All these signposts of a less enlightened time in the Nation's past, counsel argues, have been washed away by the beneficent tidal waves of "evolving standards," and so it should now be recognized by this Court with respect to laws prohibiting the cultivation of marijuana in one's home.

The process of change in the rule of law wrought by evolving standards is not always free from controversy. Counsel laid particular emphasis upon Justice Stevens' opinion in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). *Atkins* held that the execution of mentally retarded criminals are "cruel and unusual punishments" prohibited by the Eighth Amendment. In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Court had held that the Eighth Amendment did not categorically prohibit the execution of mentally retarded capital murderers. In *Atkins,* the Court revisited that question, "in light of the dramatic shift in the state legislative landscape," 536 U.S. at 310, 122 S.Ct. 2242, by which Justice Stevens meant: "Responding to the national attention received by the Bowden execution and our decision in *Penry,* state legislatures across the country began to address the issue." *Id.* at 314, 122 S.Ct. 2242. Justice Stevens' opinion cites a number of state laws prohibiting the execution of mentally retarded individuals, and adds: "It is not so much the number of these States that is significant, but the consistency of the direction of change." *Id.* at 315, 122 S.Ct. 2242 (footnote omitted). After considering a wide variety of legal and medical expressions from domestic and foreign sources, the *Atkins* Court held: "Construing and applying the Eighth Amendment in the light of our *evolving standards of decency,* we therefore conclude that such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Id.* at 321, 122 S.Ct. 2242 (citation and internal quotation marks omitted and emphasis added).

Chief Justice Rehnquist, Justice Scalia, and Justice Thomas joined in two dissenting opinions in *Atkins,* one written by the Chief Justice and the other by Justice

Scalia. Justice Scalia's dissent begins with a paragraph which reflects the tenor of both:

> Today's decision is the pinnacle of our Eighth Amendment death-is-different jurisprudence. Not only does it, like all of that jurisprudence, find no support in the text or history of the Eighth Amendment; it does not even have support in current social attitudes regarding the conditions that render an otherwise just death penalty inappropriate. Seldom has an opinion of this Court rested so obviously upon nothing but the personal views of its Members.

536 U.S. at 337–338, 122 S.Ct. 2242. One wonders if Justice Scalia would have joined the majority in *Atkins* if it appeared that "current social attitudes" wholeheartedly and uniformly condemned the execution of the offender in that case.

In the case at bar, the Marders seek to avoid forfeiture of their home by contending that such a fine would be excessive under the Eighth Amendment, given recent and continuing changes in the evolving of standards of decency and fairness respecting the legality of marijuana. Counsel suggests that the Court exercise its discretion and impose a relatively modest fine, within Sentencing Guideline boundaries.

This is not a frivolous argument. It may be something of a stretch to equate the right to grow marijuana at home with the rights to be emancipated from slavery, or to vote, or to be spared execution for a felony if mentally retarded. Nonetheless, the concept of evolving social and cultural standards as an engine of changing the legality of conduct is recognized by the Nation's constitutional law. *Atkins* teaches that lesson. A form of capital punishment that was legal before *Atkins* because it did not violate the Eighth Amendment became, by reason of the decision in *At-kins,* prohibited by the Eighth Amendment "in the light of our evolving standards of decency," as perceived by the majority of the Supreme Court Justices at the time. The Claimants at bar are entitled to careful consideration of whether this Court, discharging its responsibilities in the year of grace 2013 (rather than 2005 or 2007), should, as the result of evolving standards in respect of the legality of marijuana, reject the Government's demand to forfeit the Property and instead impose a modest fine, which the Marders would pay and go on living in their home.

One need not look far for contemporaneous reports and comments about the legality of marijuana. A Google search will get one started. I make no apology for my resort to that resource, which does not offend the Federal Rules of Evidence: the several references that follow are offered not for the truth of any assertions they contain, but rather for the fact that these public reports were made. In a case where a judicial officer is asked to decide whether a particular fine is excessive in the light of evolving public standards, that officer may test the waters through the use of such modern resources.

The Huffington Post's April 20, 2013 edition reported: "Eighteen states and Washington, D.C. have already made medical marijuana legal and 10 others are currently considering legislation to legalize marijuana, according to the National Cannabis Industry Association."

Connecticut is one of those states. The New Haven Register's April 21, 2013 edition reported: "Gov. Daniel P. Malloy signed the medical marijuana bill last May, and in October, the state began allowing patients to apply for medical marijuana licenses. So far, said Consumer Protection Commissioner Phillip Rubenstein, the state has issued about 300 licenses and received more than 400 applications."

The Huffington Post's June 30, 2013 edition reported:

Eighteen states and the District of Columbia have legalized the use of marijuana for medical purposes since California voters made the first move in 1996. Voters in Colorado and Washington state took the next step last year and approved pot for recreational use. Alaska is likely to vote on the same question in 2014, and a few other states are expected to put recreational use on the ballot in 2016.

The same edition noted: "The overarching question has big national implications. How do you do all of this without inviting the wrath of the federal government, which has been largely silent so far on how it will respond to a gaping conflict between the U.S. and state law?"

In a follow-up piece, the Huffington Post's July 15, 2013 edition quoted testimony United States Attorney General Eric Holder gave to a House Appropriations subcommittee in April. The Attorney General is reported to have said:

We certainly continue to review the marijuana legislation initiatives that were passed in Washington and Colorado. I mean, we are certainly going to enforce federal law. That is what we're going to do. Now what do we do across the board? Where there are federal criminal statutes that is the responsibility of the department to enforce them, and in making those enforcement decisions, we take into account how we can best use the resources that we have and we make determinations about where the greatest harm occurs and where we can have the greatest impact.

Based upon further reported comments, it is fair to say that both advocates and opponents of legalizing marijuana found reasons for encouragement in the Attorney General's somewhat Delphic remarks. No definitive action appears to have been taken since by the Department of Justice. As for Congress, the online version of Forbes Magazine reported on June 21, 2013: "Congressmen Jared Polis (D–CO) and Earl Blumenauer (D–OR) have introduced a bill to end the federal prohibition on marijuana and allow it to be taxed. This legislation would remove marijuana from the Controlled Substances Act. That way growers, sellers and users could no longer fear violating federal law." No change in the federal statute would appear to be imminent: at this bleak moment in the Nation's history, Congress does not seem capable of doing anything of substance. The divisions of opinion in the body politic are manifest; the Huffington Post's April 20, 1913 edition reports:

A majority of Americans support weed legalization, according to a recent Pew Research Center poll.

Still, opponents of marijuana legalization argue that any fiscal benefits from legalization are outweighed by the social impact. Legal weed will continue to contribute to violence, crime, and social disintegration of the country, according to a report from the Heritage Foundation, a conservative think tank.

After careful consideration, I find myself unable to conclude that legal and societal standards in the United States have evolved to the extent that forfeiture of a private home, held to be *not constitutionally excessive* by the Second Circuit in *von Hofe* in 2007, becomes in closely similar circumstances *excessive* in 2013. It is worth noting that in *Atkins v. Virginia*, relied upon by Claimants, Justice Stevens was able, while reviewing evolving standards of decency, to say: "In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not be carried out upon a person who is mentally

retarded.'" That federal legislative manifestation of an evolving standard is not available to the Marders in this case: the Controlled Substances Act continues to prohibit the manufacture and cultivation of marijuana, without any exception for medical use. The Attorney General, asked by a committee of Congress about marijuana, asserts that the Justice Department "is certainly going to enforce federal law." To be sure, one may detect among some state legislatures the direction of change in favor of legalizing marijuana, and I am mindful of Justice Stevens' admonition that in such matters direction is more important than numbers; nonetheless, those states are in a minority (although Connecticut is now one of them), and this federal Court owes initial deference to the federal statute pursuant to which the Government brings this action. While this Court owes greater, indeed the greatest deference to the Constitution, I am bound by the Second Circuit's decision in *von Hofe*, which is indistinguishable from this case on its facts and statutory reasoning, and requires me to hold that if the Government is determined to forfeit the Marders' home, it is entitled to do so.

I conclude this decision with another opinion by Judge Kravitz: *United States v. One Parcel of Property Located at 35 Ruth Street, Unit 30 Bristol, Connecticut*, No. 3:06–cv–1844, 2008 WL 4005299 (D.Conn. Aug. 25, 2008). One Wesley Musumano was convicted in a state court for selling hard drugs out of his apartment in Bristol. Musumano served a state prison sentence. The federal Government brought an action to forfeit his apartment. Judge Kravitz conducted a bench trial, of the sort he had conducted previously in *von Hofe* and I have done in the case at bar. In Judge Kravitz's words:

> At trial, Mr. Musumano admitted his drug trafficking and described a tumultuous childhood in which he was raised by drug-addicted parents and drugs were in ample supply in the household. He also testified that he had successfully completed drug programs in prison and was no longer addicted to drugs. Mr. Musumano's state probation officer also verified Mr. Musumano's efforts to turn his life around and reunite with his son.

2008 WL 4005299, at *2. In these particular circumstances, the Government decided to go ahead with the forfeiture of Musumano's apartment. Judge Kravitz reviewed the authorities (including the Second Circuit's opinion in *von Hofe*), reached the unsurprising conclusion that the Government was entitled to forfeiture of the apartment, and ended his opinion by saying this:

> One could rightly question the wisdom of the Government's decision to render Mr. Musumano homeless at the precise time in his life when he appears to be on the road to rehabilitation and recovery. Depriving Mr. Musumano of a home for himself and his son cannot possibly aid in his substantial and commendable efforts to turn his life around and to become a law-abiding member of society. It also cannot help his efforts to reintegrate into his community. But whether it is wise or sensible in these circumstances to deprive Mr. Musumano of a home is a decision that the United States Attorney must make. The only question for this Court is whether, having made the decision to seek Mr. Musumano's home, the Government has sought to impose a punishment that violates the U.S. Constitution. Given the facts and circumstances of this case, the Court has no doubt that forfeiture is not grossly disproportionate within the meaning of CAFRA and governing legal precedent. Accordingly, requiring Mr. Musumano to forfeit his entire interest in the Property does not violate the

Excessive Fines Clause of the Eighth Amendment.

2008 WL 4005299, at *3.

This balanced and nuanced reflection is the handiwork of a great judge, who stayed strictly within the boundaries of his responsibility to decide the legalities of the case but did not hesitate to add his thoughts concerning its human aspects. That broader view may reflect the reality that in modern federal practice, a trial judge is trained to think and act as both judge of the law and chancellor in equity. In Musumano's case, Judge Kravitz properly recognized the legal limitations of his judicial office—"whether it is wise or sensible in these circumstances to deprive Mr. Musumano of a home is a decision that the United States Attorney must make"—but felt no inhibition in giving voice to what one may call equitable considerations. A critic could, I suppose, dismiss that part of this passage as dicta pronounced by an activist judge; but "activist" in that context, whether used as noun or adjective, often means only that the critic disagrees with what someone else said or did.

My purpose in this case is to emulate Judge Kravitz, not for the first and I anticipate not for the last time, which is to say:

The Court holds that requiring Mr. and Mrs. Marder to forfeit their entire interests in the Property does not violate the Excessive Fines Clause of the Eighth Amendment.

The Government, having achieved that litigation objective, may wish to consider whether, in the totality of the present circumstances, depriving the Marders of their home best serves the justice and wisdom of the cause.[6]

## IV. CONCLUSION

The Government is directed to serve upon Claimants' counsel and submit to the Court a proposed form of Judgment consistent with this Decision, no later than August 16, 2013. Upon entry of the Judgment, the Clerk is directed to close this case.

IT IS SO ORDERED.

---

6. In that regard, it may be noted that after the Second Circuit held in *von Hofe* that the Government could forfeit the home in question, "[o]n remand, the parties entered into a settlement agreement wherein $160,000 was forfeited by Mr. and Mrs. von Hofe to the Government." This footnote to history is contributed by a district court in another circuit: *see United States v. 11290 Wilco Highway,* No. 3:11–cv–640, 2013 WL 1412865, at *3 (D.Or. April 5, 2013). Presumably, the von Hofes paid the agreed amount and went on living in their home. Whether a similar disposition is possible in the case at bar is up to the parties.